### SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

### INTERNATIONAL LOAN NETWORK, INC., Melvin J. Ford, and Odell Mundey, Defendants.

#### Civ. No. 91–1102.

United States District Court, District of Columbia.

July 18, 1991.

---

Nancy Grunberg, Securities & Exchange Com'n, Washington, D.C., for plaintiff.

Robert Plotkin, Paul, Hastings, Janofsky & Walker, Julian Greenspun, Alexia Morrison, Washington, D.C., for defendants.

## MEMORANDUM OPINION

### THOMAS F. HOGAN, District Judge.

On May 15, 1991, the plaintiff Securities and Exchange Commission (SEC) applied to this Court for an *ex parte* temporary restraining order enjoining defendants from committing federal securities violations and freezing defendants' assets, among other things. The Court granted the requested temporary relief upon the SEC's showing that there was a justifiable basis for believing that defendants had sold securities in violation of the registration provisions of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, (the 1933 Act), and of the antifraud provisions of the 1933 Act and the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, (the 1934 Act).

On May 30, 1991, defendants International Loan Network, Inc., and Melvin Ford sought and received a modification of the temporary restraining order and asset freeze to permit defendants to retain counsel on their behalf and to enable them to meet necessary business and living expenses, among other things. Defendant Odell Mundey subsequently sought and was granted minor modifications of this Order. After an expedited discovery period, the SEC filed a Motion for a Preliminary Injunction, Order Freezing Assets, Appointment of a Receiver and Other Ancillary Relief on June 21, 1991. After the Oppositions and Reply were filed, this Court conducted a three-day evidentiary hearing from July 1, 1991 to July 3, 1991. Counsel for all parties delivered lengthy closing arguments on July 8, 1991.

## FINDINGS OF FACT

The defendants in this case are the International Loan Network, Inc. (ILN); its president and founder, Melvin J. Ford; and its vice president, Odell Mundey. The substance of the case is the SEC's allegation that the ILN and its various affiliates and subsidiaries are nothing more than a "Ponzi"[1] or pyramid scheme which produces no significant products or services but makes its money almost solely through the sale of new memberships in the organization. The ILN, Ford, and Mundey argue that the ILN

---

1. The term "Ponzi" scheme derives from Charles Ponzi, a notorious swindler who, during eight months in the early 1900s, took in over $9 million by selling his own notes for $100 apiece with the promise to repay investors $150 dollars within 90 days. *See Cunningham v. Brown,* 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1923).

provides a variety of valuable benefits and services to its members, that none of its programs involves the offer or sale of "securities" within the meaning of the 1933 and 1934 Acts, and that the ILN has in good faith attempted to comply with federal and state securities laws in the operation of its programs.

After three days of live testimony and one full day of argument, there is, unfortunately, much that remains unclear about the operation of ILN and its programs. What appears in ILN documents has been directly contradicted by witness testimony and by transcripts of ILN meetings and video presentations. Programs as described in testimony and in written material are frequently incomprehensible. Questions propounded by the Court to both witnesses and counsel have been left unanswered. In short, because of significant gaps in the evidence presented, the Court's own findings are necessarily limited. When in doubt, however, the Court has relied on the words of the ILN's founder and president, Melvin Ford, whose oral presentations have been preserved on video and audio tapes introduced as evidence in this case.

According to Ford, "ILN is a financial distribution network whose members believe that through the control of money and through the control of real estate you can accumulate wealth and become financially independent." Plaintiff's Exhibit 101 at 12 (Transcript of Melvin Ford's presentation at the Los Angeles, California "President's Night" on April 18, 1991) (hereinafter President's Night Transcript). This concept boils down to one essential phrase, which is repeatedly referred to by Ford and other ILN representatives in the numerous exhibits filed in this case: "The movement of money creates wealth." President's Night Transcript at 37.

To become a member of the ILN and gain the opportunity to achieve the organization's stated goal of financial independence, a person must, at a minimum, pay a $125 "basic" membership fee. This fee, which is retained in its entirety by the organization, entitles a basic member to a variety of "benefits and services" including discount shopping, discount travel and car rental, and other similar discounts. These benefits are provided by Consumer Benefit Services, Inc., by virtue of a contract with the ILN.

Beyond the basic membership, a person may become a "club member" in ILN's $100, $500, or $1,000 clubs. Each of these clubs requires an investment of these respective additional amounts, plus the $125 basic membership fee. Club memberships entitle members to the benefits provided to basic members plus newsletters and various seminars on money management and other topics. In addition, as a member of the $500 or $1,000 club, a person becomes eligible to participate in the ILN's Property Rights Acquisition program (PRA), which offers real estate training courses and videotapes, among other things.

The PRA program, along with the Capital Fund Bonus System and the Maximum Consideration program, are the primary programs alleged by the SEC to violate the federal securities laws and will be discussed in detail below. All are marketed through a network of ILN marketing representatives and independent representatives. These representatives invite potential members to local ILN meetings and "President's Nights," where the sales pitches for the organization are made. Melvin Ford is the central speaker at the President's Nights, which are held in hotels throughout the country and draw large crowds of members and potential members. At these meetings, Ford has been known to enter with his family down a central aisle to the soundtrack from the movie "Flashdance." He then delivers a lengthy presentation that is part motivational and part financial evangelism. He rouses the crowd with chants such as "I will not accept defeat" and "I'm the captain of my ship." He is both engaging and persuasive. The highlight of his presentation is his "reward" to the audience members by showing them "how you make money in ILN" through the three programs that are the focus of this lawsuit. President's Night Transcript at 31.

## I. ILN PROGRAMS

### A. *The Capital Fund Bonus System*

According to Melvin Ford, the Capital Fund Bonus System (the Capital Fund) "is the most powerful financial system since banking." President's Night Transcript at 31. This is the system by which ILN members earn income by recruiting others to join the ILN. Although the ILN's written material makes it clear that a person need not be a member of the ILN in order to solicit new members, it is equally clear that the Capital Fund is marketed so that a person will first join the organization himself and then recruit others to join. The process is repeatedly explained at ILN meetings and President's Nights with the chant: "You come in, then you bring in your wife and your kids." President's Night Transcript, *passim.*

To earn money through the recruitment of others, a person must apply to become an "Independent Representative" of the ILN and must sign an "Independent Representative Agreement." This agreement specifies that as an Independent Representative, the person must abide by all federal, state, county, and local laws and regulations and must not engage in "deceptive, misleading, or unethical practices." ILN's Exhibit 2 at 10 ("Income Opportunity" brochure describing ILN's Capital Fund Bonus System) (hereinafter Income Opportunity brochure). For each new member recruited, an Independent Representative receives 50 percent of the new member's club membership fee.[2] Each new member represents a "Capital Fund" for the Independent Representative, from which additional income may derive. Through these Capital Funds, an Independent Representative receives descending percentages of the club membership fees paid by new members recruited "downline" through the fifth level of recruitment. ILN explains this in its

materials by referring to "Daddy Tom" recruiting "Sister Sue," "Cousin Bob," "Aunt Mary," and "Uncle Joe." Each person recruited by Daddy Tom becomes a Capital Fund for Daddy Tom. He then gets 50 percent of the club membership fees paid by these new recruits. Additionally, Daddy Tom receives 15 percent of the club fees paid by anyone recruited by the people he recruited. He also receives 15 percent of the third level of recruits, and 10 percent of the fourth and fifth levels of recruits. *See* Income Opportunity brochure at 5–6.

The opportunity to earn income through the ILN Capital Fund program is substantial. At the evidentiary hearing conducted in this case, Lee Steverson, the director of membership for the ILN, testified that he had earned over $68,000 since 1989 through the Capital Fund. Mr. Steverson had only directly sponsored 12 people into the ILN. The Court also heard testimony that H.L. Barner, an associate marketing representative for the ILN, had 250 people in his "downline" and had earned substantial income by recruiting new ILN members.

The success of those like Barner and Steverson was highlighted by Melvin Ford at President's Nights throughout the country. At an April 1991 President's Night in Los Angeles, California, Ford told the audience that a member's downline could grow to over 3,000 Capital Funds and that there were people in California making over $30,000 in one month through the Capital Fund. "It's too simple, isn't it," he said, "You come in, then you bring in your wife and your kids." President's Night Transcript at 40.[3]

### B. *The Property Rights Acquisition Program (PRA)*

This program has been through several incarnations, almost all of which offered

---

**2.** Independent Representatives receive a share of the $100, $500, and $1,000 club membership fees paid by those they recruit, but not of the $125 administrative fee that is also paid by all new members but retained by the ILN.

**3.** Ford also stressed the income many ILN members had received through the Capital Fund in a videotape called "Common Ground" that was shown to many potential ILN members at

meetings around the country. The tape included testimonials of several people who had earned substantial income through the Capital Fund. *See* Plaintiff's Exhibit 24 (Video Tape "Common Ground" and Transcript) (hereinafter Common Ground Transcript). H.L. Barner, among others, gave testimony that he had received a Capital Fund check that matched his income as a captain in the U.S. Army.

the opportunity for those investing $1,000 or more to receive huge cash returns on their investments or the right to acquire property worth many times the amount of their investments. To participate in the current PRA program as well as all of its predecessor programs, a person must first have purchased a $500 or $1000 club membership.

### 1. The Property Acquisition Certificate (PAC) Program

Instituted in the fall of 1989, this was the first in the series of programs leading up to the current PRA program. This program was marketed as an opportunity for every ILN member to achieve a "guaranteed lifetime income." *See* Plaintiff's Exhibit 24 at 29 (Video Tape "Common Ground" and Transcript) (hereinafter Common Ground Transcript).[4] Under the PAC program, investors of $10,000 were told they would receive either $100,000 of equity in real estate within 90 days or $100,000 in income payable in monthly installments of approximately $1,500 starting within 180 days (the Standard PAC). ILN guaranteed investors that if the monthly checks fell below $1,000 per month, ILN would refund the $10,000 investment plus 50 percent interest. *See* Common Ground Transcript at 31. Investors of $25,000 were told they would receive either $250,000 worth of equity in real property within 90 days or income of $50,000 per year for their lifetimes, payable in monthly installments of just over $4,000 (the Super PAC). ILN guaranteed investors in the Super PAC that if their monthly payments fell below $2,500, ILN would refund the entire $25,000 investment plus 50 percent interest. *See* Common Ground Transcript at 33.

The PAC program was discontinued in mid–1990 after an investigation and settlement with securities regulators in North Carolina. Much of the money taken in through the PAC program was returned to investors. Significantly, counsel for the ILN admitted during closing arguments that the PAC program "quite possibly" involved the offer and sale of a security.

### 2. The PAC–List Program

This transitional program took the place of the PAC program after its discontinuance in early 1990. Under this program, investors of $1,000, $5,000, or $10,000 allegedly were promised the rights to real property or, the evidence indicates, large cash "settlements" within 180 days. The duration of this program is unclear from the evidence, but the program operated in all material respects like the Property Rights Assignment program that took its place within a very short period of time.

### 3. The Property Rights Assignment (PRA) Program

The PRA program was initiated in May 1990. Written materials describing the program promised investors "an opportunity to acquire property below market value." Plaintiff's Exhibit 39 at 1 (Property Rights Assignment brochure). ILN offered this opportunity through the assignment of tax lien sale certificates or rights to property acquired by ILN through foreclosures or government-assisted programs. According to the PRA brochure, purchasers of $1,000 PRAs would be assigned property rights assessed at $10,000; purchasers of $5,000 PRAs would be assigned property rights assessed at $50,000; and purchasers of $10,000 PRAs would be assigned property rights assessed at $100,-000. The assignments were to be made within 180 days of the purchase of a PRA.

The oral descriptions of the PRA program, as testified to by several SEC witnesses who had purchased PRAs, differed significantly. These witnesses testified that at meetings conducted by ILN representatives, potential purchasers were promised the option of cash payments of five times their investments in lieu of the property rights assignments. In other words, for a $1,000 PRA, a purchaser had the option of $10,000 worth of property rights

---

**4.** In keeping with the evangelistic tenor of ILN's marketing, Melvin Ford described the Property Acquisition Certificate as a "ceremonial document" backed up by a contract providing people with guaranteed benefits. Common Ground Transcript at 30.

*or* $5,000 in cash. At least two of the witnesses testifying for the SEC stated that they had no interest in acquiring property and they had been persuaded to purchase PRAs solely because of the promise of a large cash return through no effort of their own. These witnesses specifically asked the people recruiting them whether they would have to recruit others in order to receive their money. They were told that if they were not interested in recruiting, then the PRA program was the program for them. Each of these witnesses was shown checks made out to others who had purchased PRAs. The checks were for amounts of five times the amounts originally invested and were dated within 30 days of the dates of the original investments. One witness testified that she and others at the ILN meeting she attended specifically inquired about why ILN's written documents did not mention the five-to-one cash option. She was told that the Internal Revenue Service (IRS) was investigating the program and that because of this, even though the program was legal, the cash option could only be mentioned in private. This witness and others also testified that they were promised a full refund if they were dissatisfied with the program. At least two of the SEC's witnesses testified that they had submitted written requests for refunds as early as February 1991, but still had not received any money back.[5] None of these witnesses were impeached at the hearing and the Court thus accepts their testimony as credible.

Several witnesses for defendants testified that they had never heard Ford or Mundey guarantee a five-to-one cash return to PRA purchasers. Moreover, ILN's director of membership, Lee Steverson, testified that Independent Representatives were repeatedly reminded through memoranda and other written documentation not to make such unauthorized offers. Nevertheless, the unrebutted testimony of Lewis Goolsby, a former consultant for ILN who was involved in designing software for the PRA program, revealed that in May 1990, Odell Mundey directed him to print "settlement" checks for all PRA members at five times their initial investment. Goolsby testified that $22 million in checks were printed and delivered to Mundey. The checks were not subsequently distributed through a single mass mailing, but were held back so that they could be distributed either shortly before or actually at the President's Nights and other ILN meetings in various cities throughout the country. The evidence before the Court indicates that some of the checks were never distributed.

Steverson's explanation for the five-to-one checks was that they were settlements for the company's inability to assign property to PRA purchasers within the 180–day time period promised. According to Steverson, the property that ILN had acquired at the time was too overvalued to assign, therefore, the company offered PRA purchasers cash settlements of 50 percent of the assessed value of the property rights they had expected, which, the Court notes, equals five times the initial PRA investment. Steverson acknowledged that some cash settlements were made within one month of the initial PRA purchase, rather than at the end of 180 days, and that settlement checks were distributed at President's Nights. This testimony was corroborated by the testimony of H.L. Barner, an associate marketing representative for ILN, who received such a cash settlement of $50,000 in June 1990 for a $10,000 PRA he purchased in May 1990. Barner acknowledged that he had shown his check to potential PRA purchasers, although he claims he only did this in the privacy of his home and not at public meetings. Despite Steverson's and Barner's consistent testimony that no guarantees about cash returns were ever made, both had family members who received five-to-one cash payments. Steverson's fiancee received a $5,000 payment for her $1,000 PRA. Bar-

---

5. The SEC alleges that over $11 million in refunds has been requested and only $2 million has been paid. The SEC also alleges that of the $500 million in real property and tax lien certificates that the ILN has promised to its investing members since May 1990, the company has only $4 million in cash, $5 million in real estate equity and $75 million in assessed value of tax lien certificates with which to satisfy these obligations.

ner's wife, mother, mother-in-law, brother, and uncle all purchased PRAs and received checks in amounts equalling five times their investments. Most, if not all, received their checks within 30 days of their investments. None received property rights assignments. In fact, defendants have presented no evidence that anyone ever received a property rights assignment under the former PRA program.

Although the Court accepts the testimony of Steverson and Barner that the word "guarantee" was not used in connection with the PRA program, the Court finds incredible any testimony that potential recruits were not led to believe they could expect cash returns on their PRA investments.[6] The Court makes this determination based upon inconsistencies in Steverson's and Barner's testimony, their inability to explain details of the programs, and their demeanor on the witness stand. Additionally, if the PRA program had not been marketed as providing five-to-one cash payments, there would have been no reason for the ILN to make these payments other than for display to potential investors. ILN was only otherwise obligated to provide a refund if it could not provide the promised property rights assignments.

### 4. The Property Rights Acquisition Program (PRA)

In March 1991, the PRA program was revised yet again.[7] The name was changed from Property Rights *Assignment* program to Property Rights *Acquisition* program. Under this program, a $1,000 PRA entitled the purchaser to three real estate training courses. Purchasers of $5,000 PRAs were entitled to seven courses and five videotapes with accompanying workbooks. Purchasers of $10,000 PRAs were entitled to 12 real estate courses and 12 videotapes with accompanying workbooks. In addition, purchasers of any of these PRAs receive the right to use the PRA Selection Service to acquire tax lien certificates or real property, based on availability. As it has been described to the Court, this service consists of a listing of available properties and tax lien certificates that PRA members may review and make selections from. If a PRA member chooses to acquire any of the property rights on the selection list, the member must pay all acquisition costs and related expenses. To date, under both the former PRA program and this new program, only one property selection list has ever been distributed to PRA members.

### C. The Maximum Consideration Program

The Maximum Consideration Program, like the revised PRA program, is a fairly recent addition to the ILN portfolio of programs. Perhaps this is why the program is a source of confusion for not only the Court but, as the recently concluded hearing revealed, for many others including counsel and witnesses. Three times the Court has read the "Representative's Guide to Maximum Consideration" and the transcript of Melvin Ford's explanation of the program at a recent President's Night. Three times the Court has been left wondering where the truth lies.

According to the written materials describing the program, Maximum Consideration is a "special award opportunity for representatives of ILN who have evidenced that they are in the process of acquiring real property for purposes other than a personal residence." Defendants' Exhibit 39 at 1 (A Representative's Guide to Maximum Consideration). To be eligible for the award, a person must have achieved $3,000 in PRA sales and have placed a verifiable earnest money deposit check on an agreement to purchase real estate other than for use as a personal residence. Purchasing a

---

6. One of the SEC's witnesses, Shirley Pleasant, testified that not only did H.L. Barner show her copies of five-to-one checks received by Barner and his wife, he also told her that she and her husband would be "stupid" to take property rights when they could get cash.

7. Lee Steverson testified that purchasers of the old PRAs had the option of continuing in the old program or transferring into the new program. No other evidence was introduced regarding the retroactivity or nonretroactivity of the new PRA program.

PRA apparently satisfies the second requirement. Once eligible, only the top 10 producers of PRA sales are guaranteed an award. This award is a minimum of $5,000. Others, however, are eligible for awards of up to five times their original PRA purchase price or real estate contract deposit, based upon PRA sales volume, the amount of money invested, and the length of time they have been in the program. The Representative's Guide to Maximum Consideration is explicit that all awards other than those guaranteed to the top ten producers are in the sole discretion of ILN.

Oral representations of the program differ significantly. According to Melvin Ford, the purpose behind the Maximum Consideration program is to "raise[ ] the volume in the Capital Fund." President's Night Transcript at 46. As the Court understands Ford's explanation, a person who purchases a $1,000 PRA, a $5,000 PRA, and a $10,000 PRA, for a total of $16,000, is eligible for an award of up to $80,000 because, according to Ford, "all of a sudden the velocity of money increases to such a point, the ability to create wealth expands to such a degree, that we could come back and give somebody an award for up to $80,000." President's Night Transcript at 46–47. To be eligible for this award requires three things, according to Ford: a person must purchase a PRA or have a real estate contract, he or she must sign an acknowledgement form stating that ILN has not guaranteed anything, and he or she must sell $3,000 worth of PRAs. For those who don't want to recruit anybody, they are urged to simply bring in their spouses at the $5,000 PRA and then their $3,000 sales volume requirement will be satisfied.

In his President's Night presentation, Melvin Ford is careful not to make any guarantees. Over and over again he explains that Maximum Consideration is an award and not a guarantee. At the same time, however, he urges people to participate in the program by explaining that "the system does work." President's Night Transcript at 48. "No, we can't guarantee you any money," he says, "but we sure have got a system that can produce some." Id. at 53.[8]

Guarantee or no guarantee, the evidence before the Court reveals that several members of ILN's marketing team, as well as others outside the company, received "Maximum Consideration" award checks as recently as April 1991. These awards were distributed at President's Nights just as the former settlement checks had been. The display of these checks no doubt had the same effect on potential PRA purchasers as the settlement checks had on a number of witnesses and affiants who testified that they were persuaded to purchase PRAs when they saw the checks that others had received.[9]

## II. ILN SUBSIDIARIES AND AFFILIATES

In addition to the basic memberships, club memberships, and Capital Fund, PRA, and Maximum Consideration programs, the ILN owns several subsidiaries that defendants argue are legitimate, profit-making enterprises providing real services to ILN members and others. Whatever the legitimacy or value of the services provided by these entities, the evidence presented makes it clear that all are wholly dependent upon the ILN for funding and ultimate managerial direction.

### A. *ILN Development Corporation (ILNDC)*

This subsidiary was incorporated in June 1990 to acquire real estate throughout the United States, including property for assignment to PRA members. The evidence presented by the SEC indicates that the ILNDC did not receive any particular allocation of revenues from the PRA program with which to make its acquisitions. In-

---

**8.** At one point Ford explained to his audience that "I have to use the right words here—you know, we could intend to do a lot of things, but you only say it a certain way." President's Night Transcript at 53.

**9.** Additionally, Patricia Redden, who attended a recent President's Night in Baltimore, Maryland, testified that Ford represented that by putting money into the ILN, a person would receive five times that amount in return.

stead, when the ILNDC needed funds for a particular acquisition, it would request the money from Ford and the funds would be made available.

### B. *ILN College Education Services, Inc. (ICES)*

This for-profit subsidiary officially began operating on October 1, 1990. Since then it has incurred operating expenses of about $300,000 and has generated revenues of $110,000. According to its acting president, Jayme Sokolow, PhD., the funds to meet ICES's expenses come from the ILN.

For a $500 fee, ICES provides a five-year membership that includes the provision of books, teaching and study aids, educational materials, and assistance in obtaining educational financing and scholarships. For an additional fee, the membership is open to non-ILN members. According to Dr. Sokolow, ICES is currently in the process of establishing a foundation for the purpose of granting scholarships to ICES members on a funds-available basis. The application for tax-exempt status for the foundation is currently pending before the Internal Revenue Service. Despite the fact that the foundation is not yet officially in existence and has no funds whatsoever, Dr. Sokolow acknowledged that a brochure sent to ILN members last year represented that by enrolling a child in ICES, the child would be eligible to receive $25,000 in scholarships from the ICES Foundation. The brochure represented that the Foundation was funded through a $1 million endowment and was expecting another $1 million endowment by the end of 1991.

### C. *ILN Financial Services, Inc. (IFS)*

This subsidiary was created to provide insurance, tax, and personal finance services to ILN members and the general public. A $550 fee covers a variety of services from the IFS, including tax preparation and a quarterly tax newsletter.

### D. *ILN Real Estate Services (IRES)*

This ILN subsidiary was established in February 1991 to provide real estate brokerage services and assistance in obtaining mortgages. It also provides real estate training for ILN club members and PRA members. Additionally, according to its president, James Wilson, the company is available to do construction management and consulting. Mr. Wilson testified that although IRES had not turned a profit before this Court issued its Temporary Restraining Order, the company was expected to turn a profit by the end of the year. There is some evidence in the record that ILN representatives have promised members that the ILN would loan money to its members for the acquisition of property, although this service is not provided by IRES. *See* Plaintiff's Exhibit 50 at 12.

### E. *Imaginative Concepts & Designs, Inc. (ICON)*

This subsidiary does not provide any direct benefits to members. Rather, it is a printing and graphics company, formed in October 1990 to compete for large commercial accounts. It purchased a large amount of sophisticated graphics equipment with money from ILN that its president, Vanessa Bigelow, testified the company intended to pay back. Additionally, according to Ms. Bigelow, ICON intended to begin paying its own salaries this year. These salaries have at all times been paid by the ILN. Although Ms. Bigelow referred to various oral contracts that the company had entered into indicating that it would soon be self-sufficient, rebuttal testimony offered by the SEC indicated that these so-called "contracts" were greatly exaggerated. Accordingly, the Court has no evidence before it to support the claims that ICON would have been able to operate independently of the ILN in the near future.

### CONCLUSIONS OF LAW

The SEC has the authority to bring this litigation by virtue of § 20(b) of the 1933 Act and § 21(e) of the 1934 Act. The language of § 21(e) states that "[w]henever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this title, the rules or regulations thereunder ..., it may in its

discretion bring an action in the proper district court ... to enjoin such acts or practices, and *upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.*" (Emphasis added). The language of § 20(b) is substantially similar.

■ Under the law of this district, a proper showing is "a justifiable basis for believing, derived from reasonable inquiry or other credible information, that such a state of facts probably existed as reasonably would lead the SEC to believe that the defendants were engaged in violations of the statutes involved." *SEC v. General Refractories Co.,* 400 F.Supp. 1248, 1254 (D.D.C.1975) (Pratt, J.).[10] In *SEC v. Vaskevitch,* 657 F.Supp. 312 (S.D.N.Y.1987), the court noted that the SEC is entitled to a preliminary injunction if "the evidence establishes a strong *prima facie* case of previous violations and a reasonable likelihood that the wrong will be repeated." *Id.* at 315. With respect to an asset freeze, the court noted that it "certainly has the ability to ensure that the defendants' assets are not secreted or dissipated before entry of final judgment concluding this action." *Id.*

■ A major difference between this preliminary injunction standard and the common law standard is that in SEC enforcement cases, the court is "guided by the primary objectives of the statute involved using public interest standards as opposed to private litigation requirements." *General Refractories,* 400 F.Supp. at 1254 (citations omitted). When in conflict, the public interest is paramount. *Id.* (citations omitted).

The threshold question this Court faces in determining the appropriateness of injunctive relief is whether any of ILN's programs involve the offer or sale of a "security" as defined by § 2(1) of the 1933 Act and § 3(a)(10) of the 1934 Act. If securities are involved, the Court will have to determine whether the SEC has made a *prima facie* case that defendants have violated and are likely to continue to violate

§ 17(a) of the 1933 Act and § 10(b) of the 1934 Act and rule 10b–5 thereunder by offering and selling securities based on misrepresentations and incomplete information.

## I. ARE ILN'S PROGRAMS SECURITIES?

### A. *Statutory and Case Law*

The statutory definitions of a security in § 2(1) of the 1933 Act and § 3(a)(10) of the 1934 Act are very broad, covering stocks, notes, and bonds as well as investment contracts and profit-sharing agreements. If the ILN programs at issue in this case are "securities," it will be because they fall into definition of "investment contracts" as defined in the relevant decisional law.

■ The Supreme Court set forth the basic test regarding investment contracts in *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946): "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of the promoter or a third party." *Id.* at 301. The test is meant to coincide with a broad construction of the 1933 and 1934 Acts, which, as remedial legislation, were "designed to protect the American public from speculative or fraudulent schemes of promoters." *SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). Thus, the definition of a security "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey,* 328 U.S. at 299, 66 S.Ct. at 1103. Form should be disregarded in favor of substance and economic reality. *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967).

Two landmark cases involving pyramid schemes are particularly relevant to the case now before the Court. In *SEC v.*

---

10. To grant permanent injunctive relief, the standard in this circuit requires that the SEC prove statutory violations by a preponderance of the evidence. *SEC v. Savoy Industries,* 587 F.2d 1149 (D.C.Cir.1978), *cert. denied,* 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979).

*Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973), the Ninth Circuit held that a pyramid scheme involving the sale of certain "Adventures" and "Plans" constituted the sale of "investment contracts" within the meaning of the federal securities laws. The court affirmed the lower court's issuance of a preliminary injunction prohibiting the sale of these Adventures and Plans and freezing the defendants' assets except for those expended in the regular course of business.

In *Glenn W. Turner*, a subsidiary of the corporate defendant, Dare to Be Great (Dare), offered to prospective purchasers four different Adventures and a $1,000 Plan. For Adventures I and II, at a cost of $300 and $700 respectively, purchasers received tapes, records, and other self-motivation material, as well as the right to attend group sessions. For Adventures III and IV and the $1,000 Plan, purchasers received the same things received by the purchasers of Adventures I and II, plus the opportunity to sell the Adventures and the $1,000 Plan to others in return for a commission correlating in amount to the type of Adventure sold. The court held that Adventures III and IV and the $1,000 Plan were investment contracts because they met the test set forth in *Howey*. Obviously, the purchase of Adventures involved an investment of money. The *Glenn W. Turner* court found it just as obvious that the money was invested in a "common enterprise," which it defined as "one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." 474 F.2d at 482 n. 7 (citations omitted). It was the final element, requiring profits "to come solely from the efforts of others," *Howey*, 328 U.S. at 301, 66 S.Ct. at 1104, that the Ninth Circuit had the most difficulty with. Because the income opportunities through Dare required individuals to sell Adventures and Plans to others, the income was not based "solely" on the efforts of others.

The Ninth Circuit nevertheless held that the word "solely" "should not be read as a strict or literal limitation on the definition of an investment contract, but rather must be construed realistically, so as to include within the definition those schemes which involve in substance, if not form, securities." 474 F.2d at 482. The court then held that the Dare scheme was "no less an investment contract merely because [the investor] contributes some effort as well as money to get into it." *Id.*

The Ninth Circuit's approach was adopted and elaborated upon by the Fifth Circuit in *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir.1974). In that case, Koscot was, like Dare, a subsidiary of Glenn W. Turner Enterprises. Through Koscot, investors could make money by both selling cosmetics and by recruiting "supervisors" and "distributors" to sell cosmetics and recruit others.[11] To obtain the right to make money through the recruitment of others required an investment of at least $1,000. Such an investment qualified a person as a "supervisor" who could then recruit other supervisors. For every supervisor recruited, the recruiting supervisor received $600 of the $1,000 paid by the new supervisor. For $5,000, an investor could become a "distributor" who could then recruit both supervisors and distributors in return for a share of their investments.

In *Koscot*, the Fifth Circuit reversed the lower court's denial of a preliminary injunction motion brought by the SEC. Because it could not be disputed that the scheme involved an investment of money, the court focused on the second and third elements of *Howey*. In discussing the common enterprise element, the court recognized that "[t]he critical factor is not the similitude or coincidence of investor input, but rather the uniformity of impact of the promoter's efforts." 497 F.2d at 478. Citing *Howey*, it noted that the profits need not be pooled, but the "feasibility and success of the enterprise, in attracting individuals to invest"

---

**11.** The court's analysis of the existence of a security focused on the recruitment aspects of the Koscot scheme, not the sale of cosmetics.

must rely on the management of the enterprise. *Id.* (citing *Howey*, 328 U.S. at 300, 66 S.Ct. at 1103 ("A common enterprise managed by respondents or third parties with adequate personnel and equipment is therefore essential if the investors are to achieve their paramount aim of a return on their investments.")). Using this analysis, the Fifth Circuit held that "the requisite commonality is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the Koscot meetings and guidelines on recruiting prospects and consummating a sale." 497 F.2d at 473.

Having determined that the first and second elements of *Howey* had been met, the Fifth Circuit moved on to adopt the Ninth Circuit's interpretation of "solely from the efforts of others." The court noted that a literal interpretation of the requirement would frustrate the remedial purposes of the 1933 and 1934 Acts. Thus, the court agreed with the Ninth Circuit that "the critical inquiry is 'whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.'" *Id.* at 483 (citing *Glenn W. Turner*, 474 F.2d at 482).

It should be noted that within this district there is some variance from the law set forth in *Glenn W. Turner* and *Koscot.* In *Meredith v. Conticommodity Services, Inc.*, 1980 Fed.Sec.L.Rep. (CCH) ¶ 97,701 (D.D.C.1980) (Gasch, J.), the district court rejected the Fifth Circuit's commonality approach as impermissibly collapsing the second and third elements of *Howey*. It read *Koscot* and another Fifth Circuit case, *S.E.C. v. Continental Commodities Corp.*, 497 F.2d 516 (5th Cir.1974), to find commonality whenever the investors' success depended upon the skill of the promoter. In place of the *Koscot* approach it seemed to favor a definition of commonality requiring some correlation between the profits and losses of individual investors and the

fortunes of the investors as a group (horizontal commonality) or with the enterprise itself (vertical commonality).

With respect to the third element of *Howey*, this circuit appears to be in relative agreement with the *Glenn W. Turner* and *Koscot* opinions. In *One–O–One Enterprises, Inc. v. Caruso*, 848 F.2d 1283 (D.C.Cir.1988), the court rejected the application of the *Howey* test to stock options, which it held were traditional securities instruments, but noted without disapproval that *Howey* requires profits to come significantly from the efforts of others although not solely from their efforts. *See also Baurer v. Planning Group, Inc.*, 669 F.2d 770 (D.C.Cir.1981) (recognizing that other courts of appeals had adopted the standard set forth in *Glenn W. Turner* and applying it to promissory notes at issue in the case).

### B. Does ILN Offer or Sell Securities?

As a preliminary matter, defendants urge the Court to disregard the ILN's former PAC, PAC–List, and PRA programs because these programs are no longer in existence. Defendants argue that only the current PRA program, instituted in March 1991, is relevant to this litigation. Because one of ILN's own executives testified that purchasers of the original PRAs had the option of transferring into the new PRA program or continuing in the original program, it is clear that the PRA program as it has existed since May 1990 is relevant to the pending motion before the Court. Additionally, the Court may consider the PAC and PAC–List programs insofar as they assist the Court in determining whether the applicable preliminary injunction standard has been met, *i.e.*, whether the SEC has made a *prima facie* case of past violations and a reasonable likelihood that the wrongs will be repeated. *See SEC v. Vaskevitch*, 657 F.Supp. 312, 313 (S.D.N.Y.1987); *SEC v. General Refractories*, 400 F.Supp. 1248, 1255 (D.D.C.1975).[12]

---

**12.** Additionally, the Court finds the former PAC, PAC–List, and PRA programs relevant under a doctrine typically used when mootness is an issue. The Supreme Court held as long ago as 1897 that "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case." *United States v. W.T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) (citing *United States v. Trans–Missouri Freight Ass'n*, 166 U.S. 290, 17

Accordingly, the Court will review ILN's various programs to determine whether any of them involves the offer or sale of investment contracts as defined by *Howey, Glenn W. Turner,* and *Koscot.*

### 1. The Basic Membership and Club Memberships

■ With respect to the $125 basic membership and the $100, $500, and $1,000 club memberships, standing alone, it is clear to the Court that the *Howey* test cannot be met. Simple membership in any of these plans does not convey the opportunity to earn income separate from what may be earned through the Capital Fund Bonus System and the Maximum Consideration Program. Regardless of the value that the Court may place on the "benefits" and "services" offered by virtue of basic or club memberships, these memberships do not, in and of themselves, involve the offer or sale of securities.

### 2. The Capital Fund Bonus System

■ The Capital Fund Bonus System is a pure pyramid scheme, virtually indistinguishable from that enjoined by the court in the *Glenn W. Turner* case. Independent Representatives earn income from the system solely through the recruitment of new members. As Melvin Ford said at the April 1991 President's Night, the recruitment of members by simply saying "you come in, then you bring in your wife and your kids," is what "makes ILN what it is." President's Night Transcript at 54. "And if a lot of people do that," says Ford, "it is thousands and thousands of people that are going to have an opportunity to

change their life, to get that extra leg up in life." *Id.*

Defendants have carefully crafted the Capital Fund program so that it does not fit the *Howey* test precisely. The Independent Representative Agreement that must be signed to participate in the program specifically states that one need not be an ILN member in order to earn money through the program. If one need not be an ILN member, then the program does not fit the first prong of the *Howey* test, requiring an "investment of money." *Howey,* 328 U.S. at 301, 66 S.Ct. at 1104. To the Court, the distinction is merely technical and appears to be a deliberate attempt to avoid the application of the test. A reading of the transcript of Melvin Ford's presentation at a recent President's Night, as well as the testimony of those who have repeatedly heard him speak, makes it clear that the intent is for a person to become a member first and then recruit new members. Thus, the oft-repeated slogan, "you come in, then you bring in your wife and your kids." President's Night Transcript, *passim.*[13] Looking to the substance, rather than the form, of the Capital Fund program, this Court holds that the first prong of the *Howey* test has been met.

The second element of the *Howey* test requires the investment to be in a "common enterprise." *Howey,* 328 U.S. at 301, 66 S.Ct. at 1104. This test is met whether the Court looks to *Glenn W. Turner, Koscot,* or the opinion of my colleague on this court in *Meredith v. Conticommodity Services, Inc.,* 1980 Fed.Sec.L.Rep. (CCH) ¶ 97,701

---

S.Ct. 540, 41 L.Ed. 1007 (1897)). Not only does the power to hear a case remain intact, so too does the court's power to grant injunctive relief. *W.T. Grant,* 345 U.S. at 633, 73 S.Ct. at 897. This is so because there may still be a dispute over the legality of the challenged practices and the defendant remains free to "return to his old ways." *Id.* at 632, 73 S.Ct. at 897. Additionally, "a public interest in having the legality of the practices settled, militates against a mootness conclusion." *Id.* Without commenting at this juncture about the legality of the ILN's former programs, the Court believes the rationale behind this mootness doctrine to be applicable to the case at bar.

**13.** Additionally, it is probable that many people are unaware that they can participate in the Capital Fund Bonus System without first becoming an ILN member. The Independent Representative Agreement is four pages long and contains 33 lengthy provisions in relatively small type. The provision stating that one need not be an ILN member to be an Independent Representative is buried amongst these other provisions. *See* Income Opportunity brochure at 8. To the extent that people sign up immediately following Ford's motivational speech, it is highly unlikely that they are aware of this totally unemphasized provision.

(D.D.C.1980) (Gasch, J.). In *Meredith,* the court intimated that commonality requires a correlation between the profits and losses of individual investors and the fortunes of the investors as a group or with the enterprise itself. The profits of investors in the Capital Funds Bonus System are directly related to the fortunes of other investors: it is through the constant recruitment of new members in one's "downline" that income is earned. If the people directly recruited by an Independent Representative do not vigilantly spread the word "you come in, then you bring in your wife and your kids," then that Independent Representative will not earn much income through the program. Additionally, investors' profits are linked to the success or failure of ILN as a whole because it is the ability to proclaim the organization's success that is the central selling point of the program. The testimonials presented in the videotape "Common Ground" illustrate the crucial role that the organization plays in recruitment.

Just as the Capital Fund program meets the commonality element of *Howey,* so too does it meet the "solely from the efforts of others" element of *Howey.* 328 U.S. at 301, 66 S.Ct. at 1104. Without a doubt, to earn money through the Capital Fund program requires some effort on the part of the investor. If an investor does not recruit a single new ILN member, that person will receive absolutely no income through the program. However, only a minimal effort is needed in order to earn substantial income through the program. As Melvin Ford repeatedly says: "you come in, then you bring in your wife and your kids." If each of them recruits one person, who recruits one person, who recruits one person, an investor will already have a five-level "downline." Moreover, to be credited with recruiting a new member may involve as little as inviting someone to an ILN meeting or President's Night. If the ILN marketing representatives or Mel-vin Ford himself are successful in persuading the potential recruit to join, the person who extended the invitation, otherwise known as the "sponsor," will be credited as having made the recruitment and will earn income from it. Adopting the approach of the Ninth and Fifth Circuits, as well as that condoned by this circuit, this Court holds that "the efforts made by those other than the investor are the undeniably significant ones." *Glenn W. Turner,* 474 F.2d at 482. Thus, the Capital Fund Bonus System involves the offer or sale of an investment contract within the meaning of the 1933 and 1934 Acts.[14]

### 3. The PAC, PAC–List, Original PRA, and Revised PRA programs

■ The PAC and PAC–List programs, as well as the original PRA, fit relatively neatly into the *Howey* mold: Clearly, each involved an investment of money. Similarly, each involved a common enterprise in the *Koscot* sense that the fortunes of investors were inextricably tied to the efforts of ILN management and in the narrower sense that the fortunes of individual investors correlated to the fortunes of ILN itself. Purchasers of each of these programs relied entirely on ILN to provide them with the rights to acquire real estate or with straight cash. If ILN had gone bankrupt or been otherwise unable to make good on its obligations (as the evidence indicates may have been near), the fortunes of those awaiting large returns on their investments would have plummeted. As to the third element of *Howey,* it is clear from the evidence that purchasers of the PAC, PAC–List, and PRA relied solely on the efforts of others to obtain profit, whether through the assignments of property or the payment of cash. Accordingly, the Court holds that the PAC, PAC–List, and original PRA programs involved the offer or sale of investment contracts within the meaning of the 1933 and 1934 Acts.

---

**14.** The Court has already held that the basic membership and club memberships, standing alone, are not investment contracts. It is important to note, however, that one cannot become a club member without a sponsor, who earns income from the fees paid by all new club members he "brings in." Thus, the club memberships do not currently have an existence apart from the Capital Fund Bonus System.

The PRA program initiated in March of this year appears to have been specifically tailored to avoid being deemed an investment contract. The program still involves an investment of money, but for that money, according to the written descriptions of the program, a purchaser is entitled only to real estate training courses, videotapes, and the opportunity to receive a list of property from which they may select to purchase real estate or tax lien certificates *at their own expense.* Not only does the written material fail to offer any kind of cash return, it fails to offer any assignment of property rights. Clearly, if ILN's written material were all the Court had to go on, the newly initiated PRA program would not be held to be an investment contract. If, however, the program continues to be orally marketed as providing five-to-one cash returns to investors, then the program would almost certainly be deemed an investment contract within the meaning of *Howey.* At this preliminary stage, the Court finds it unnecessary to conclusively determine this question. This is so because the Court will hold below that the Maximum Consideration Program, which is inextricably intertwined with the PRA program, constitutes the offer or sale of an investment contract within the meaning of the 1933 and 1934 Acts.

### 4. The Maximum Consideration Program

■ To participate in this "special award opportunity" a person must purchase a PRA or have made a deposit on a real estate contract. This requirement, obviously, involves an investment of money. The money is placed into a "common enterprise" because, as is made clear in ILN's own brochures, the ability to obtain an award through the program is within the sole discretion of ILN and depends upon the availability of funds. Thus, the profits or losses of those investing correlate to the profits or losses of ILN as a whole. Additionally, Melvin Ford's explanation of the program as "increasing" the "velocity of

money" and "expanding" the "ability to create wealth," almost mandates the conclusion that a common enterprise is involved.[15] Finally, the profit earned through the Maximum Consideration program is expected to come almost entirely from the efforts of others. The only effort a participant must expend is the effort to sell $3,000 worth of PRAs. This can be done with minimal effort, Ford explains, by following the simple slogan, "you come in, then you bring in your wife and your kids." Although defendants have argued that there is no reason for either a purchaser of a PRA or a participant in the Maximum Consideration program to expect to profit, the evidence is to the contrary. The Court has already found that the oral representations of both ILN's representatives and Ford himself conveyed the message that for an investment of $1,000, $5,000, or $10,000, a person could expect a five-to-one return within a relatively limited period of time. Repeatedly telling potential recruits that there are no guarantees, but "the system does work," is tantamount to making promises of large cash returns, whether they be through "settlements" from the old PRA program or "awards" from the new Maximum Consideration program. Accordingly, the Court holds that the Maximum Consideration program involves the offer or sale of investment contracts within the meaning of the 1933 and 1934 Acts.

Because the Court has held that the Capital Fund Bonus System, the PAC, PAC–List, and PRA programs, and the Maximum Consideration program each involve the offer or sale of securities, defendants are in violation of § 5 of the 1933 Act for failing to file registration statements for each of these securities with the SEC.

## II. HAVE DEFENDANTS VIOLATED THE ANTIFRAUD STATUTES?

Section 17(a) of the 1933 Act and § 10(b) of the 1934 Act and rule 10b–5 promulgated thereunder prohibit fraud or misrep-

---

**15.** The Court continues to be puzzled about why neither defense counsel nor any of defendants' witnesses has been able to explain how the velocity of money creates wealth. The Court regrets that Melvin Ford did not take the stand to more fully explain his novel theory.

resentation in the offer or sale of securities. Rule 10b–5 provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

Section 17(a) of the 1933 Act is substantially the same except that it applies only to fraud or misrepresentations in connection with the *offer* or sale of securities, not with the *purchase* or sale of securities. Despite their similarities, the rule and the statute have been interpreted differently by the Supreme Court. In *Aaron v. SEC*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980), the Supreme Court held that scienter is a necessary element of a violation of § 10(b), rule 10b–5, and § 17(a)(1), *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), but that scienter need not be proven as an element of a violation of § 17(a)(2) or (a)(3).[16] Nevertheless, the Supreme Court has acknowledged that scienter may be a factor to consider for § 17(a)(2) and (a)(3). Both the SEC and the defendants agree that scienter may be proven by a showing of recklessness. *See, e.g., SEC v. Carriba Air, Inc.*, 681 F.2d 1318 (11th Cir.1982); *Coleco Indus., Inc. v. Berman*, 567 F.2d 569 (3d Cir.1977), *cert. denied*, 439 U.S. 830, 99 S.Ct. 106, 58 L.Ed.2d 124 (1978); *Sanders v. John Nuveen*, 554 F.2d 790 (7th Cir.1977).

In addition to the scienter requirement, to the extent the alleged violations fall under subsection (2), involving a misrepresentation or omission, there is a materiality requirement. This simply means that the misrepresentations or omissions must have been such that a reasonable investor would consider them important. *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

■ With respect to whether misrepresentations have been made concerning ILN's programs, the evidence is clear that ILN is nothing more than a glorified chain letter, destined to collapse of its own weight. Despite the inevitability of this outcome, potential investors were, until the issuance of the temporary restraining order in this case, continuing to be promised great wealth through their participation in the ILN. The pyramid nature of the organization was never fully revealed to them.

Although defendants have not addressed materiality in either their brief or their oral argument, they have argued vigorously that there is no evidence of scienter. As the Court has already noted, ILN's written materials do not make false claims of huge cash returns on investments. Additionally, ILN's Independent Representatives and Marketing Representatives have been repeatedly instructed not to make false statements or veer from the official written descriptions of ILN's programs. ILN has frequently sent memos to its marketing employees instructing them not to use unauthorized materials to try to promote ILN. This seems to the Court to almost prove too much. It is a valiant effort to create a paper trail showing defendants' efforts to comply with the law. The problem is that the paper trail is contradicted by oral statements of Ford and others and by ILN's history and stated goals.

ILN's original Super–PAC program "guaranteed" regular monthly cash payments for life. No explanation was ever given for where the cash was to come from to make the promised payments. To the Court, the program appears to have been a deliberate attempt to induce unsophis-

---

**16.** The subsections (1), (2), and (3) are substan-    tially the same in both the statute and the rule.

ticated investors to invest $10,000 or $25,000 in an impossible dream. When this program was scrapped, the PAC–List and original PRA programs took its place and, although they looked better on paper, the evidence has revealed that the oral statements about these programs contained just as many unsupported promises as the PAC program. On paper, the programs offered the rights to property assessed at 10 times the amount invested within 180 days. ILN failed to inform investors that it did not have the property to make good on these promises. Orally, the programs were pitched as offering the option of a five-to-one cash payment within 180 days. No explanation has been given for where this money was to come from. When asked by the Court, one witness said she was told that ILN invested in real estate with the money from PRAs. No evidence of such investments was ever presented to the Court, however, except for Lee Steverson's statement that the real estate acquired by ILN was too valuable to assign to PRA purchasers. This statement was not corroborated by defendants' own counsel who, when asked by the Court how ILN made its money, responded that it was through the sale of basic memberships and PRAs.[17]

With respect to the March 1991 version of the PRA program and the Maximum Consideration program, it is clear to the Court from the testimony presented and from the transcript of the April 18, 1991 President's Night that the oral presentations about these programs are intended to induce purchasers by stopping just short of guaranteeing them large cash "awards." At the President's night, Melvin Ford

slipped on his language three times in a row, stating at first that "you will receive" and correcting himself with "you will be eligible" to receive a lump-sum award. Ford even went so far as to explain to the audience that "I have to use the right words here—you know, we could intend to do a lot of things, but you only say it a certain way." President's Night Transcript at 53. The Court finds the repeated oral statements made in contradiction to ILN's written materials is strong evidence of defendants' scienter.

■ The Court is further convinced that an ultimate finding of scienter is likely because of the failure of defendants Ford and Mundey to testify in rebuttal to the claims against them. Neither defendant was called by his own counsel or the SEC at the preliminary injunction hearing, but each had previously asserted his fifth amendment rights during depositions.[18] The Supreme Court held in *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1557, 47 L.Ed.2d 810 (1976), that the fifth amendment does not prohibit drawing adverse inferences against parties to civil proceedings "when they refuse to testify in response to probative evidence offered against them." The Court implied, however, that a party's silence should be "given no more evidentiary value than [i]s warranted by the facts surrounding his case." *Id. See also Lefkowitz v. Cunningham*, 431 U.S. 801, 808 n. 5, 97 S.Ct. 2132, 2137 n. 5, 53 L.Ed.2d 1 (1977) (*Baxter* permits consideration of silence as one of the factors to be considered). Defendants make elaborate arguments why the SEC's behavior in

---

**17.** Illustrative of defendants' method of making money is the affidavit of William Watson, a former consultant to ILN who was responsible for designing computer software programs to manage the funds raised by the company. Watson testified that when asked to design the software for the PAC–List program (the predecessor to the original PRA), he had concerns about the program that he expressed in a meeting with Ford and Mundey:

> At this meeting, held during the Spring of 1990 in Ford's office, I compared the whole PAC idea to the medieval alchemists' idea that gold could be made from manure and to the similarly implausible notion of a perpetual motion machine. That brought laughter.

> That's what we have here: a "perpetual money machine," Ford or Mundey said, insisting erroneously that the financial drag of the huge PAC list return rate could be overcome by the volume of dollars in the PAC list money pool.

Plaintiff's Exhibit 30 at 3 (Affidavit of William Watson).

**18.** This fact is in the record by virtue of a brief *submitted* by counsel for Odell Mundey. This brief argued that the Court should not draw an adverse inference from either defendant's failure to testify prior to the preliminary injunction hearing.

this case, the fast track on which this litigation has been proceeding, and the preliminary nature of this proceeding do not warrant any adverse inference from the individual defendants' decisions not to testify. Nevertheless, in light of the probative evidence the SEC has gathered against defendants Ford and Mundey, the Court will draw a limited adverse inference from their failure to testify in their own defense. That is, the Court will consider the defendants' failure to testify, in addition to all of the other probative evidence introduced, to support its conclusion that an ultimate finding of scienter is likely.

### RELIEF

The Court has held that the Capital Fund Bonus System, the PAC, PAC–List, and original PRA programs, and the Maximum Consideration program all involve the offer or sale of investment contracts within the meaning of the 1933 and 1934 Acts. The Court has also held that defendants have violated § 5 of the 1933 Act by offering and selling unregistered securities. Furthermore, the Court has held that the SEC has made a *prima facie* case of violations of the antifraud provisions of both Acts through the abundant evidence of misrepresentations and scienter. Defendants have given no indication that they will voluntarily cease offering or selling the programs this Court has held to be investment contracts. Rather, it is obvious to the Court from the testimony and argument during the preliminary injunction hearing, as well as from the deluge of letters and phone calls to Chambers, that there exists an organized and widespread effort to continue to build the pyramid upon which the organization rests.[19] Accordingly, a preliminary injunction is necessary to prevent

further violations and to protect the investing public. The Court shall enjoin defendants and their officers, agents, and employees from offering or selling those programs that the Court has held to be investment contracts.

In addition to injunctive relief, the SEC seeks a continuation of the asset freeze and the appointment of a receiver. It is undisputed that the Court has the authority to enter an appropriate freeze order in an SEC enforcement action. *See S.E.C. v. American Board of Trade, Inc.*, 830 F.2d 431 (2d Cir.1987); *S.E.C. v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir.1973); *S.E.C. v. Manor Nursing Centers*, 458 F.2d 1082 (2d Cir.1972). As the Second Circuit has noted, in deciding whether to issue such an order, "the disadvantages and possible deleterious effect of a freeze must be weighed against the considerations indicating the need for such relief." *Manor Nursing Centers*, 458 F.2d at 1106.

In this case, a continuation of the asset freeze virtually would put ILN out of business. If the case were ultimately resolved in defendants' favor, it would probably be too late to resurrect the company and build back its goodwill. Nevertheless, the Court has been presented with probative evidence that defendants took in over $80 million dollars through a pyramid scheme that was bound to collapse once the market became saturated. The revenue earned by ILN was predominantly from the sale of new PRAs and the club memberships necessary to purchase PRAs. The small amount of revenue earned through ILN's legitimate businesses, such as the sale of basic memberships and the sale of services by ILN's various subsidiaries, would not have been enough to keep the

---

**19.** Several hundred letters, most of them form letters which were obviously widely distributed among ILN's members, have been sent to Chambers in support of ILN. The Court has made these letters part of the public record in this case. Although fewer in number, there have been some calls and letters from those who do not support ILN and seek a refund of their investments. In one such letter, a woman indicated that she had invested over $38,000 in ILN from a loan secured by her house. She had

requested a refund, but had not received it and is currently facing foreclosure.

In addition to organizing a broad letter-writing campaign, ILN supporters made their presence known throughout the four days of the preliminary injunction hearing. This hearing, which was continued over the Fourth of July holiday, was attended by numerous spectators who crowded the Courtroom and filled the exterior hallway.

company afloat absent the revenues generated through the illegal sale of unregistered securities. According to the SEC's as-yet-undisputed allegations, the ILN has $500 million worth of obligations to investors, but has only $4 million in liquid assets, $5 million in real property, and tax lien certificates for property worth $75 million in assessed value. The Court is concerned that if the ILN's assets do not remain frozen, there may be little left for distribution to the investors if this case ultimately results in a permanent injunction and disgorgement. Accordingly, the Court will continue the asset freeze with respect to ILN's assets. The Court will, however, lift the freeze on the personal assets of defendants Ford and Mundey. The Court has thus far been presented with no evidence of improper diversion of assets or secreting of assets by the individual defendants. Unless and until the SEC produces such evidence, defendants Ford and Mundey shall be entitled to access to their personal assets.

Because of the draconian nature of the relief ordered in this case, the Court will refrain from appointing a receiver at this time. Instead, the Court will leave the disbursement agent in place for 30 days, or until further Order of this Court, so that defendants may review this ruling and exercise their rights to appeal, if they choose. The disbursement agent shall have the powers set forth in the temporary restraining order. In addition, he shall have the authority to make payments to legitimate creditors who are not part of the ILN family.

By accompanying Order, the SEC is directed to submit a proposed Order consistent with the terms outlined in this Memorandum Opinion. Defendants will then have the opportunity to comment on the proposed Order. Until the Court's final ruling on the Order, the temporary restraining order shall remain in effect, except with respect to the individual defendants' personal assets.

## ORDER

In accordance with the Memorandum Opinion issued herewith and for the reasons stated therein, it is this 18th day of July, 1991,

ORDERED that the SEC shall, by 4:30 p.m., July 19, 1991, file with the Court and serve on defendants by hand, a proposed Order consistent with the terms set forth by the Court in the Memorandum Opinion issued herewith; and it is

FURTHER ORDERED that defendants shall, by 4:30 p.m. July 22, 1991, file with the Court and serve on the SEC by hand, any objections or comments to the proposed Order; and it is

FURTHER ORDERED that counsel for all parties shall meet and propose, by July 23, 1991 a plan for a speedy resolution of this case by a trial on the merits within approximately 60 to 90 days; and it is

FURTHER ORDERED that there shall be a status conference in this case on July 24, 1991, at 1:30 p.m., in Courtroom 9, for the purpose of scheduling the final phase of this case; and it is

FURTHER ORDERED that, pending the issuance of a final Preliminary Injunction Order, the Temporary Restraining Order shall remain in effect in this case, except that the freeze shall be and hereby is lifted with respect to the individual defendants' personal assets.