SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

THE BETTER LIFE CLUB OF
AMERICA, INC., and Robert
N. Taylor, Defendants,

and

Wilkins McNair, Jr., CPA, as Trustee,
and Elizabeth Lawson, Relief
Defendants.

No. 95–1679 (TFH).

United States District Court,
District of Columbia.

Feb. 27, 1998.

Thomas C. Newkirk, David Leon Kornblau, Securities & Exchange Commission, Washington, DC, for Securities & Exchange Commission.

William Payne, Payne, Wright & Jeter, Washington, DC, Elmer Douglass Ellis, Washington, DC, for Better Life Club of America, Inc.

Robert N. Taylor, Petersburg, VA, pro se.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

Pending before the Court is plaintiff's motion for summary judgment against defendants Better Life Club of America, Inc., and Robert N. Taylor and against the relief defendants. After considering the numerous submissions of each party, the Court will grant summary judgment for plaintiff on all counts and will dismiss defendants' counterclaims with prejudice. The Court will also grant summary judgment for plaintiff on Count Four of the Second Amended Complaint, which asserts a claim against the relief defendants.

### I. Background

The defendants in this case are the Better Life Club of America ("BLC") and Robert N. Taylor, its president. The substance of the case is plaintiff's allegation that defendants ran a "Ponzi"[1] or pyramid scheme which produced little or no profit through legitimate means, but which instead obtained profits solely through the sale of memberships and the attraction of new investors to the scheme. Plaintiff Securities and Exchange Commission ("SEC") alleges that defendants have committed three violations of federal securities laws: (1) the sale of unregistered securities in violation of 15 U.S.C. § 77e; (2) securities fraud in violation of 15 U.S.C. § 77(q)(a); and (3) securities fraud in violation of 15 U.S.C. § 77(j)(b) and 17 C.F.R. 240.10b–5. Plaintiff seeks a permanent injunction against future violations and seeks restitution and disgorgement of funds from defendants. Plaintiff also seeks disgorgement of funds transferred to relief defendants Elizabeth Lawson and Wilkins McNair, Jr.

Defendants assert three counterclaims. These claims are for (1) tortious interference with contracts, (2) intentional infliction of emotional distress, and (3) willful invasion in violation of the Right to Financial Privacy Act of 1978. For these counterclaims defendants request $52 million in compensatory damages and $10 million in punitive damages.

Defendant Robert Taylor founded the Better Life Club of America in early 1993. The price of membership in the BLC was $39 per year, which entitled the member to a subscription to the "Better Life News," plus perks such as "free financial counseling," a one-third discount on seminars, guidebooks, and tapes, and the opportunity to participate in BLC "wealth building projects." The largest of these wealth-building projects was the "Advertising Pool." Investors in the Advertising Pool were promised that their investment would be "doubled" within 60 to 90 days.[2] Ostensibly, the invested funds were to be used to "advertise Better Life Club 900–Lines and to promote other profit-making business activities." These profitable ventures were supposed to generate sufficient returns to pay investors.

At no time did defendants attempt to register these Advertising Pool "contracts" as securities under any federal or state laws. The Advertising Pool investment opportunity was promoted in a variety of publications, fliers, letters, and other media. Most of these promotions contained references to past performance and to the Club's optimism for the future, but each also stated, unequivocally and without reference to risk or uncertainty, that each investor would receive double his investment in either 60 or 90 days.

Between January 1, 1993 and August 31, 1995, the effective life of the operation, the BLC received over $45 million in funds invested through the Advertising Pool.[3] The

---

1. The term "Ponzi" derives from Charles Ponzi, a ground-breaking swindler who, in eight months in the early 1900's, took in over $9 million by selling notes for $100 with the promise to pay $150 for each note in 90 days. *See Cunningham v. Brown,* 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924).

2. The timing of repayment varied between investors. Investors who were give the "Agreement

Form 60" were promised double their money in 60 days; those who received "Agreement Form 90" were promised payment in 90 days. Apart from the timing elements, however, the forms were essentially identical.

3. The Court appointed an impartial Special Administrator to examine the accounts of the BLC

Special Administrator estimates that approximately $41 million of the collected funds were paid out to investors before August 31, 1995, and that those investors received a full, 100% return on their investments. However, on September 1, 1995, when the SEC brought this action and obtained an asset freeze on BLC accounts, the Advertising Pool was on the verge of collapse. According to both the Special Administrator and BLC's own accountant, relief defendant McNair, the Club had only $2.7 million in its accounts [4] and had investor obligations in excess of $51.6 million that were to come due over the next 90 days. Thus, it was apparent at that time that defendants could not have provided their promised investment payments.

The BLC "profit-making" ventures never managed to turn a profit. Although the "Better Life News" may have made modest strides as a subscription paper, other ventures—including the vaunted "900 Number" services—were consistent financial losers. Even defendants admit to the Court that the "900-number" services failed to generate any income. Therefore, almost all funds that were coming into BLC accounts were made up of new investments, not of profits from Club activities. [5]

Defendant Taylor received substantial sums of money from BLC accounts during his two and a half year reign at the helm of the Club. The Special Administrator estimates that defendant Taylor received in ex-cess of $800,000—perhaps as much as $1.2 million. [6] Defendant Taylor claims that much of that $800,000 was spent on Club-related business expenses, but admits to receiving at least $544,000 as "compensation" from Club accounts. In reality, the figure is likely much higher, since defendant Taylor has documented no more than $158,000 in expenses, many of which are highly questionable. [7] Although defendants claim that this compensation was derived solely from membership payments, BLC bank records—submitted by defendants themselves—indicate that membership dues amounted to less than $200,000 over the course of two and a half years. Furthermore, since BLC's activities were not producing significant profits, defendant Taylor's compensation must have derived from investor funds. Defendant Taylor received cash, and also used funds drawn from BLC accounts to finance a house, a 40 foot swimming pool, at least three automobiles, [8] and trust funds in excess of $120,000 for his two sons. In addition, defendant Taylor gave relief defendant Lawson a cashier's check for $7500, joint ownership of the house, a 1992 Jaguar, and a $50,000 "loan" made to payable Lawson's business, Ruby Communications. There is no evidence that defendant Taylor ever disclosed to investors that he would take "compensation" from BLC accounts, which were made up almost entirely from investor funds and membership fees, nor did he ever

and to submit an accounting report that detailed the operations, income, payouts, assets, and liabilities of the BLC. The Special Administrator submitted his report on March 4, 1996; the report provided as much detail as possible about what funds the Club received and how those funds were disposed. The Court also has the separate report of relief defendant McNair, who had prepared his accounting based on information gained as outside accountant to the Better Life Club. The Court has reviewed both accountings, as well as other documentary evidence submitted by both parties, to arrive at its conclusions concerning the financial situation of the BLC and of the Advertising Pool.

4. The BLC also held promissory notes on over 101 loans, totaling over $1 million. However, many of these loans were made to associates of defendant Taylor, and most are unsecured by any collateral. Few of these loans have been repaid, and the remaining loans are unlikely to generate substantial repayment income.

5. The Special Administrator's Report concludes that the BLC received at most $117,894,000 from Better Life News subscriptions and advertising and from seminar sales.

6. Defendant Taylor maintained complete control over all BLC finances, which apparently were spread throughout at least 27 bank accounts. The net amount of his personal withdrawals could, in fact, exceed the Special Administrator's figures.

7. For example, defendant Taylor claims as expenses a money order made payable to "The Cruise Connection" as well as receipts for hair care products, a car alarm, a Talking Chess Tutor, a television and a VCR.

8. The automobiles were a 1994 Ford Crown Victoria for defendant Taylor, a used Pontiac Firebird for one of defendant Taylor's sons, and a 1992 Jaguar for relief defendant Lawson. There may have been an additional automobile purchased for defendant Taylor's brother.

disclose the extent of those "compensation" payments.

## II. Summary Judgment

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp., v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Plaintiff's Complaint contains three counts for relief: for the sale of unregistered securities, in violation of 15 U.S.C. § 77e (Count One); for securities fraud, in violation of 15 U.S.C. § 77q(a) (Count Two); and for securities fraud, in violation of 15 U.S.C. § 77j(b) and 17 C.F.R. 240.10b–5 (Count Three). Defendants assert three counterclaims, for tortious interference with contracts, for intentional infliction of emotional distress, and for willful invasion in violation of the Right to Financial Privacy Act of 1978.

Plaintiff moves for summary judgment on all three counts of the complaint. Plaintiff also moves for summary judgment on defendants' three counterclaims.

## III. Sale of Unlicensed Securities

Count One of the Amended Complaint asserts that defendants violated § 5 of the Securities Acts. That statute makes it unlawful for anyone

> "to make use of any means of interstate commerce or of the mails to offer to sell or offer to buy...any security, unless a registration statement has been filed as to such security."

15 U.S.C. § 77e(c). The statute also makes it illegal to actually sell such securities. 15 U.S.C. § 77e(a). Plaintiff asserts that defendants' marketing of the Advertising Pool investment violates this statute.

There are no material factual disputes underlying this count. It is undisputed that defendants offered the opportunity to invest in the Advertising Pool and that persons accepted that offer and conveyed funds to defendants for investment in the Pool. It is undisputed that the Advertising Pool transactions involved the mails and other instrumentalities of interstate commerce. It is further undisputed that defendants never filed any registration statements regarding the Advertising Pool.

Rather than raise factual defenses, defendants argue that their Advertising Pool activities were not subject to regulation under the Securities Acts, and therefore that they do not create liability under § 77e. Defendants first argue that the notes given in exchange for the Advertising Pool investment funds were not securities. They then argue that, even if the Advertising Pool notes were securities, they were exempted from the registration requirements, because they had a maturity of less than nine months.

Defendants first argue that the BLC did not sell sold securities, but merely executed promissory notes in exchange for loan agreements. Such loan agreements are not literally covered by the Securities Act; however, in keeping with the flexible, remedial nature of securities laws, courts distinguish between traditional, commercial promissory notes, which are outside the Securities Acts, and "investment contracts," which are subject to regulation. *See SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), *rehearing denied,* 329 U.S. 819, 67 S.Ct. 27, 91 L.Ed. 697; *Baurer v. Planning Group, Inc.,* 669 F.2d 770 (D.C.Cir. 1981); *Securities and Exchange Commission v. International Loan Network, Inc.,* 770 F.Supp. 678, 688–92 (D.D.C.1991), *aff'd,* 968 F.2d 1304 (D.C.Cir.1992). Under a test developed by the Supreme Court, a transaction is an "investment contract" if persons invest or loan money to a common enterprise with a promise or expectation of profits to come solely from the efforts of others (generally the promoter or a third party). *Howey,* 328 U.S. at 299. Courts have applied this definition to many situations, including pyramid schemes. *See International Loan,* 770 F.Supp. at 692.

Even the language of BLC's own promotional literature demonstrates that these "loans" were investment contracts under *Howey.* The transactions involved several individual investors who contributed substantial funds to a common enterprise (the Ad

Pool), and who were promised profits (a doubling of money) that would result entirely from the efforts of others (defendants' use of funds on 900–number and other "profit-making business activities"). These were not loans for commercial purposes, but were investment payouts disguised beneath the facade of promissory notes. It is hard to imagine a more perfect example of the *Howey* investment contract. Therefore, these Advertising Pool notes were securities, and they are subject to regulation under federal law.

Defendants next argue that, even if these promissory notes were securities, they were exempted from registration requirements by Section 3(a)(3) of the 1933 Act. That section exempts from coverage certain commercial paper that has a maturity of less than nine months. 15 U.S.C. § 78c(a)(10). Defendants argue that since the Ad Pool notes had a maturity of 60 to 90 days, they are within this "commercial paper exemption." Therefore, defendants contend, they could not sell unregistered securities in violation of 15 U.S.C. § 77e, because the notes were exempted from registration requirements.

■ Defendants are correct that § 78c contains a commercial paper exemption; however, courts have interpreted this provision very loosely, and have held that a short maturity period does not automatically exempt a security from the registration requirement. *In re NBW Commercial Paper*, 813 F.Supp. 7 (D.D.C.1992). *See also Holloway v. Peat, Marwick, & Mitchell*, 900 F.2d 1485 (10th Cir.1990), *cert. denied*, 498 U.S. 958, 111 S.Ct. 386, 112 L.Ed.2d 396; *SEC v. American Board of Trade*, 751 F.2d 529 (2d Cir.1984). In fact, the commercial paper exemption is available only for true commercial paper—short-term, high quality instruments issued to fund operations, and sold only to

sophisticated investors. *NBW*, 813 F.Supp. at 18. Therefore, while the statute creates a presumption that commercial paper is exempted, this presumption can be rebutted by evidence that sales are made available to the general, unsophisticated public, or that the investments are of less than prime quality. *Id.*

■ The Advertising Pool notes are clearly not commercial paper that is exempted from the registration requirement. These notes were offered to small-scale investors in the general public, not to typical, sophisticated, experienced purchasers of commercial paper.[9] In addition, plaintiff has demonstrated that the notes were not of prime quality.[10] Therefore, these securities were not exempt from the registration requirement, even though they carried maturity periods of less than nine months.

Finally, defendants argue that the provisions of 15 U.S.C. § 77d exempt the Advertising Pool notes from the regulations of § 77e, because the notes were not offered to the public and because they were offered only to accredited investors.[11] There is no support whatsoever for defendants' arguments. The offers to participate in the BLC and in the Advertising Pool were promoted in public newspapers and at public "wealth building" seminars, and members of the BLC were encouraged to promote the Club and its ventures to their friends, acquaintances, and other members of the general public. Therefore, it is ridiculous to assert that the Advertising Pool investment was not offered to the public.

It is equally absurd to suggest that the bulk of the Advertising Pool investors were in any way "accredited" under the meaning of 15 U.S.C. § 77(d)(6). Defendants sought to tap the savings and income of middle and

9. Indeed the BLC billed itself as a vehicle for helping the "little guy" achieve prosperity through part-time investing of small amounts in group enterprises. Thus, the BLC explicitly targeted the savings of less sophisticated, less experienced members of the public and avoided more experienced investors.

10. Among other evidence, plaintiff has shown that defendants' scheme of issuing notes was on the brink of collapse, with outstanding obligations 1700% in excess of available capital.

11. Transactions "not involving any public offering" are exempted from regulation under § 77e, 15 U.S.C. § 77(d)(2), as are transactions involving "offers or sales by an issuer solely to one or more accredited investors...if there is no advertising or public solicitation in connection with the transaction by the issuer or anyone acting on the issuer's behalf and if the issuer files such notice with the Commission as the Commission shall prescribe." 15 U .S.C. § 77(d)(6).

working class people, not of sophisticated investors. The Advertising Pool investors were precisely the type of people whom the Securities Acts were designed to protect by "promoting full disclosure of information thought necessary to informed investment decisions." *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124, 73 S.Ct. 981, 97 L.Ed. 1494 (1953); *SEC v. Murphy*, 626 F.2d 633, 642 (9th Cir.1980). Furthermore, the Advertising Pool notes were certainly promoted by "advertising" and "public solicitation," so the § 77e exemption is inapplicable. 15 U.S.C. § 77(d)(6).

The Advertising Pool notes offered by defendants were securities and were not exempt from regulation under 15 U.S.C. § 77e. Because defendants offered and sold these securities, and because these securities were not registered, defendants were in clear violation of the statute.[12] Therefore, plaintiff is entitled to summary judgment on Count I of the Second Amended Complaint.

### IV. Securities Fraud

Counts Two and Three of the Amended Complaint allege that defendants engaged in securities fraud in violation of § 17(a) of the Securities Act of 1933 and § 10(b) and Rule 10b–5 of the Securities Act of 1934. Section 17(a)(2) makes it unlawful for any person engaged in the offer or sale of securities through interstate commerce

> to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

15 U.S.C. § 77q(a). Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security...any manipulative or deceptive device or contrivance in contravention of such rules or regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Pursuant to the rulemaking power delegated by this section, the Commission promulgated Rule 10b–5, which makes it unlawful for any person

> to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

17 CFR § 240.10b–5(b) (1979).

Sections 17(a) and 10(b) (through Rule 10b–5) set forth very similar requirements for proof of securities fraud. In order to show securities fraud under these sections, the Commission must show that defendants were engaged in the sale or offer of securities through the instrumentalities of interstate commerce and that defendants made material misrepresentations or omitted material facts necessary to clarify misleading statements. 15 U.S.C. §§ 77q(a), 78j(b); 17 CFR § 240.10b–5(b) (1979); *Basic, Inc. v. Levinson*, 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *International Loan Network*, 770 F.Supp. at 694.

Despite the similarities on the other elements of fraud, however, the statutes have been interpreted differently as to the requirement of scienter. The Supreme Court has clearly stated that proof of scienter is required for the Commission to show a violation of § 10(b) or Rule 10b–5. *Aaron, v. SEC*, 446 U.S. 680, 691, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). A specific showing of scienter is not necessary to establish a violation of § 17(a)(2), although the degree of scienter may be considered by the Court in deciding whether to grant injunctive relief. *Id.* at 701.

Therefore, plaintiff must establish scienter, at least to prevail on its claim under § 10(b). However, it is clear that plaintiff may prove scienter by showing recklessness, as well as by showing knowledge. *International Loan Network*, 770 F.Supp. at 694. *See also SEC v. Carriba Air, Inc.*, 681 F.2d 1318 (11th Cir.1982); *Coleco Industries, Inc. v. Berman*, 567 F.2d 569 (3d Cir.1977), *cert. denied*, 439 U.S. 830, 99 S.Ct. 106, 58 L.Ed.2d 124 (1978), *rehearing denied*, 439 U.S. 998, 99 S.Ct. 601, 58 L.Ed.2d 671;

---

**12.** Defendants argue that plaintiff cannot demonstrate scienter. While plaintiff's evidence regarding scienter is substantial, the Court need not consider it here, because there is no requirement of scienter for a § 77e violation. *See SEC v. Thomas Kienlen Corp.*, 755 F.Supp. 936, 939 (D.Or.1991); *SEC v. National Executive Planners, Ltd.*, 503 F.Supp. 1066 (M.D.N.C.1980).

*Sanders v. John Nuveen,* 554 F.2d 790 (7th Cir.1977), *cert. denied,* 450 U.S. 1005, 101 S.Ct. 1719, 68 L.Ed.2d 210 (1981).

There is no dispute that defendants engaged in the offer and sale of securities or that they did so through the use of interstate commerce. As the Court has discussed above, the Advertising Pool notes were securities, and are covered by the Securities Acts. Furthermore, defendants distributed materials relating to the offer and sale of these notes through the interstate mails and also marketed BLC membership and these securities through the "Better Life News," which by defendants' own admission is a nationally-distributed newspaper. Therefore, it is clear that defendants' actions fall within the scope of the Securities Acts' regulation.

### A. Misrepresentations

 Defendants violated §§ 17(a) and 10(b) only if they made misrepresentations (or omissions that permitted a misconception to go uncorrected) that were material. 15 U.S.C. §§ 77q(a), 78j(b); 17 CFR § 240.10b–5(b) (1979); *International Loan Network,* 770 F.Supp. at 694. The evidence clearly established that the Advertising Pool was not a legitimate investment venture, but was instead a pyramid scheme, destined to collapse and to leave investors stranded, with millions of dollars in losses. Despite this inevitable crash, defendants continued to recruit and to entice investors with unequivocal, impossible promises of doubled money in 60 or 90 days. Defendants never revealed to potential investors that the Advertising Pool was nothing more than a pyramid scheme; thus, the entire solicitation process was itself a broad misrepresentation on the grandest scale.[13]

At the time that plaintiff filed this action and obtained an order freezing defendants' assets, the BLC accounts contained only $2.7 million. At that same time, defendants had committed to pay over $51 million to investors who had already contributed funds to the Advertising Pool. Clearly, defendants would have been unable to pay most of these investors, and would have been unable to pay out on the new investments that defendant Taylor was recruiting up until the day of the temporary restraining order. Therefore, defendants' promise of doubled money was a misrepresentation.

In addition, defendants represented that the Advertising Pool funds would be invested into the "900" number services and in "other profit-making business activities." The Advertising Pool solicitations and investment contracts implied that investors would be paid their return out of profits from these activities. In reality, none of these activities ever turned any profit.[14] Therefore, defendants misrepresented the source of investor payouts.

Furthermore, defendants misrepresented the destination of investor funds. Defendant Taylor withdrew at least $544,000—and perhaps as much as $1.2 million—as "compensation" for his personal use. As the Court has already described above, defendant Taylor's contention that these funds came exclusively from membership dues is clearly incorrect. Instead, the bulk of these monies must have come from the Advertising Pool contributions. At no time did defendants inform prospective investors that substantial sums of the Advertising Pool funds would not be invested in "profit-making business activities," but would instead be diverted to defendant Taylor's personal use.

Defendants guaranteed a 100% return on contributions to the Advertising Pool when they were clearly unable to pay back the contributions themselves, much less pay any return. Defendants misled investors as to the source of returns that were paid, and as to the use of contributions to the Advertising

---

**13.** Defendants argue that they cannot be held liable for fraudulent misrepresentations because they never made affirmative representations, but instead merely kept silent and were under no duty to disclose. Even without considering liability for material omissions, this characterization of defendants' behavior is incorrect, as the record shows below. Defendants made numerous affirmative representations as to the extent of returns, the source of those returns, and the destination of invested funds in addition to their material omission.

**14.** The possible exception is the marketing of the "Better Life News," which defendants claim had begun to turn a profit in 1995. Even if that one venture was profitable, it was only marginally so; by defendants' own estimate, the "Better Life News" produced no more than $96,000 in profits.

Pool. They misled investors as to the profitability of BLC's business ventures and as to the levels of investment in those ventures. In sum, defendants misled investors as to the nature of the Advertising Pool investment "opportunity;" defendants cleverly crafted the image of a legitimate investment pool which guaranteed a fabulous return, when in fact they were masking a grand pyramid scheme, which was teetering on the verge of collapse when plaintiff stepped in to end the masquerade.

There is no reasonable dispute as to these facts. Plaintiff has produced substantial evidence, in the form of affidavits, bank records, and other financial statements, that the Advertising Pool's obligations far outstripped its available funds. Plaintiff has also shown that the BLC "business ventures" never resulted in profits and that they were incapable of generating sufficient profit to keep the scheme afloat. Furthermore, plaintiff has shown that defendant Taylor's "compensation" must have come primarily out of Advertising Pool investments.[15] Therefore, there is no issue of material fact as to the misleading nature of defendants' representations with regard to the offer and sale of the Advertising Pool securities.

 Finally, it is obvious that these misrepresentations were material. The test of materiality is whether a reasonable investor would consider the representations important. *Basic v. Levinson*, 485 U.S. at 231–32; *International Loan Network*, 770 F.Supp. at 694. Defendants' fabulous promises were substantial inducements to investment in the

Advertising Pool, and it is more than reasonable to assume that prospective investors would have shied away had they known that the Advertising Pool was a pyramid scheme. Furthermore, no rational investor would knowingly invest in a project which never funded profitable ventures and which diverted substantial funds to the personal use of its promoters. Therefore, there is no question that defendants' frequent misrepresentations and misleading omissions were material.[16]

**B. Scienter**

 Defendant Taylor[17] argues that, even if there were substantial misrepresentations, he did not knowingly mislead his target investors, and therefore that he is not liable for securities fraud. This argument is irrelevant to plaintiff's claims under Count Two—there is no scienter required to show a violation of § 17(a)(2); therefore, plaintiff may obtain relief under that statute. Furthermore, it is clear that defendant Taylor either had actual knowledge that the representations were false, or at the very least was reckless in his lack of knowledge.

Plaintiff has shown that, as sole director, defendant Taylor was responsible for every aspect of the Better Life Club and its ventures.[18] Plaintiff has shown that he hatched the Advertising Pool scheme, oversaw its marketing, sale, and operation, and managed the finances of the entire operation. Defendant Taylor's signature is on every check and every deposit slip; he is listed as sole signator, or at least co-signator, on every BLC account that plaintiff or the Special Adminis-

---

**15.** Defendants have produced no solid evidence to rebut plaintiff's showing. Defendants' opposition consists primarily of unsworn, self-serving allegations, with no documentary support. Defendants produce minimal-bank records, and those records—deposit slips, ostensibly of membership fees—only serve to debunk defendant Taylor's claim that his $544,000 "compensation" derived from these membership fees. Therefore, defendants have not presented any significant evidence that would cause the Court to find a material issue of disputed fact.

**16.** Defendants make a desperate argument that, even if material, their misrepresentations did not cause any investor losses, and therefore are not proper grounds for plaintiff's suit. As the Court has described above, investors were on the brink of losing $25 million when plaintiff

obtained the temporary restraining order. Defendants' contention that plaintiff's actions caused this loss is ridiculous; defendants would soon have defaulted on their obligations and the investors' Advertising Pool notes would soon have been worthless, even if plaintiff had not stepped in to prevent the entrapment of more investor funds.

**17.** In considering the issue of scienter, defendant Taylor is the relevant point of inquiry because he is the only actual human person among the named defendants.

**18.** Indeed, there have been no allegations from either side that anyone but defendant Taylor had substantial control over any facet of the BLC operation.

trator has been able to locate. Given his role as lone supervisor of the BLC accounts and affairs, he must have known of the Advertising Pool's dire financial state, of the Pool's inability to make the required payouts, and of his own "compensation" withdrawals. He must have known that the "900" numbers and other BLC "business activities" consistently failed to turn any profit whatsoever, and that the Advertising Pool funds were not being directed to those ventures. Most strikingly, plaintiff has produced over a hundred checks drawn on various BLC accounts that defendant Taylor signed and made payable to himself or to cash. It is ludicrous to suggest that defendant Taylor lacks the requisite scienter as to the source and destination of those funds.

Therefore, while a showing of scienter is not even required for one of plaintiff's counts of securities fraud, it is clear that plaintiff has shown sufficient scienter to support judgment in its favor. Plaintiff has shown that defendant Taylor knew—or at least was dangerously reckless if he did not take measures to know—the complete state of affairs of the BLC and its Advertising Pool scheme. Despite all this knowledge, defendant Taylor continued to offer the Advertising Pool securities and he continued to sell them by offering the same illusory promises, bolstered by the same straw stories of profitability and financial stability.

### C. Conclusion

In order to show securities fraud, plaintiff must show that defendants were engaged in the sale or offer of securities through the instrumentalities of interstate commerce and that defendants made material misrepresentations or omitted material facts necessary to clarify misleading statements. 15 U.S.C. §§ 77q(a), 78j(b); 17 CFR § 240.10b–5(b) (1979); *Basic, Inc. v. Levinson*, 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *International Loan Network*, 770 F.Supp. at 694. Plaintiff has demonstrated that defendants were engaged in the offer and sale of securities and that defendants used the instrumentalities of interstate commerce in such sales. Plaintiff has submitted sufficient evidence to prove that defendants engaged in substantial misrepresentations and omission, that those misrepresentations were material,

and that defendants had the necessary scienter for a violation of the Securities Acts. Defendants do not rebut plaintiff's evidence or otherwise raise any material factual areas of dispute, and plaintiff is entitled to judgment as a matter of law. Therefore, plaintiff has proven its claims of securities fraud, and summary judgment is appropriate on Counts Two and Three of the Complaint.

### V. Relief

Plaintiff has requested that the Court permanently enjoin defendants and their subsidiaries and agents from violating 15 U.S.C. § 77e, 77q(a), 78j(b). Plaintiff has also requested that the Court order restitution and disgorgement in the amount of $25,805,577, plus pre-judgment interest.

Permanent injunctive relief is appropriate where a securities violation is ongoing or there is a reasonable likelihood of further violations in the future. *SEC v. First City Financial Corp.*, 890 F.2d 1215, 1228 (D.C.Cir.1989); *SEC v. Savoy Industries*, 587 F.2d 1149, 1168 (D.C.Cir.1978), *cert. denied*, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979). The Court should consider the danger of future violations based on the totality of circumstances, including whether the violation was isolated or part of a pattern, whether the violation was flagrant or deliberate, and whether defendants' business will present opportunities for future violations. *Savoy Indus.*, 587 F.2d at 1168.

The Court finds that defendant poses a great danger to the public. Defendants' violations of the securities laws were neither isolated nor merely technical; instead they were persistent, premeditated, and particularly brazen. Defendant Taylor hatched and implemented a pyramid scheme designed to ensnare hundreds of investors. Through his own efforts and those of his Better Life Club, Taylor offered fantastic promises that clearly were not true, which he knew to be false, and he helped himself to the Better Life Club coffers, which were stocked with the life savings of hundreds of investors. Defendant and his cronies continued to recruit new investors to the Advertising Pool up until the entry of the temporary restraining order, even though it was clear that the BLC could

not make good on its promises to existing defendants. Therefore, defendants' violations were part of a sustained pattern and were both flagrant and deliberate.

It is likely that defendants would attempt further violations in the future. Defendant Taylor has proven himself inclined to violate this Court's orders in the past, so there is no reason to expect him to change his ways in the future. For example, the Assistant United States Attorney has presented significant evidence that defendant Taylor consistently and continuously violated the Court's asset freeze order by withdrawing funds from BLC accounts.[19] Furthermore, the evidence in this case establishes that defendant Taylor has established a pattern of brazenly pursuing ill-gotten gains, helping himself without restraint to whatever funds he could get his hands on. Given defendant Taylor's demonstrated penchant for avaricious and unlawful behavior, even in the face of a court order prohibiting such behavior, the Court finds that he and his organization remain a risk for future violations of the Securities Acts. Therefore, permanent injunctive relief is appropriate.

▬▬▬ Plaintiff also asks the Court to order defendants to pay restitution and to disgorge their profits. The Court may order disgorgement "to deprive the wrongdoer of his unjust enrichment and to deter others from violating the securities laws." *First City*, 890 F.2d at 1230. However, because disgorgement is so specifically aimed at ill-gotten profits, it is only to be exercised over property "causally related to the wrongdoing." *Id.* Restitution, on the other hand, is appropriate to compensate the victims of defendants' wrongful acts. *See SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir.1993), *rehearing denied*, 4 F.3d 992.

▬▬▬ The Court has broad discretion in fashioning the equitable remedies of disgorgement and restitution. *See Huffman*, 996 F.2d at 803; *First City*, 890 F.2d at 1228–31. In the present case, defendants helped themselves to a substantial sum of the investors' money, much of which may likely never be recovered. At the same time, because investors' funds were paid out to keep the pyramid scheme afloat, the funds remaining in BLC accounts are insufficient to even pay back initial investments, much less to pay returns on those investments; therefore, a loss of almost $25 million is likely to be shared by hundreds of small-scale investors. For this reason, it is clear that both restitution and disgorgement are appropriate.

The reports of the Special Administrator establish that $25,805,577 of investor principals remained unreturned at the time of the temporary restraining order. This is the amount that the victims of the fraud—the investors themselves—stand to lose because of defendants' fraudulent, collapsing scheme. Therefore, this is the proper amount for an award of restitution.

Defendants are also in possession of the undeserved profits from their illegal scheme. The Court will require defendants' to disgorge these profits.[20] The Court will not require defendants to make a double payment by paying the combined amounts of both the restitution liability and the disgorgement liability. Instead, the Court will require defendants to pay a single sum of $25,805,577, plus interest, which will encompass both restitution and disgorgement.

## VI. Defendants' Counterclaims

In their Answer to plaintiff's Second Amended Complaint, defendants assert three counterclaims and request $52 million in compensatory and $10 million in punitive

---

19. On July 22, 1996, defendant Taylor pled guilty to one count of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, and to one count of criminal contempt. *United States v. Robert N. Taylor*, Cr. No. 96–233. These charges stemmed from frequent violations of the Court's asset freeze order. Defendant Taylor was sentenced on March 7, 1997, to 41 months in prison on each count.

20. By the Special Administrator's accounting, defendants took in a total of $47,869,499 in contributions and investments. Of this amount, $41,189,894 was paid back to investors as return on their Advertising Pool investments. In addition, a certain amount came from membership dues and other sources, which were not improperly obtained. Plaintiff has submitted evidence to support its contention that these "profits" amounted to $117,894. Therefore, the amount of disgorgement would be $47,869,499 less the $41,189,894 payouts, less the "legitimate" profits of $117,894.

damages. The counterclaims are for (1) tortious interference with contracts, (2) intentional infliction of emotional distress, and (3) willful invasion in violation of the Right to Financial Privacy Act of 1978. Plaintiff has moved to dismiss these counterclaims.

■ Defendants' counterclaims must be dismissed under Section 21(g) of the Securities Acts. That section provides that

no action for equitable relief instituted by the Commission pursuant to the securities laws shall be consolidated or coordinated with other actions not brought by the Commission, even though such other actions may involve common questions of fact, unless such consolidation is consented to by the Commission.

15 U.S.C. § 78u(g). This statute bars, among other things, a defendant's counterclaims. *See SEC v. Lorin,* No. 90 Civ. 7461, 1991 WL 155767 at *1 (S.D.N.Y. Aug.7, 1991). The Commission has not consented to defendants' assertion of claims in this action; therefore, defendants' counterclaims are barred from consolidation with this action and must be dismissed. *Id.; See also SEC v. Electronics Warehouse, Inc.,* 689 F.Supp. 53, 72 (D.Conn.1988), *aff'd, SEC v. Calvo,* 891 F.2d 457 (2d Cir.1989), *cert. denied,* 496 U.S. 942, 110 S.Ct. 3228, 110 L.Ed.2d 674.

■ Defendants' claims also must be dismissed on their merits. The first two counterclaims assert causes of action that are covered by the Federal Tort Claims Act (FTCA). *See, e.g., Lorin,* 1991 WL at *1–2; *Art Metal–U.S.A., Inc. v. United States,* 753 F.2d 1151, 1153 (D.C.Cir.1985) (Interference with contracts is tort claim under FTCA). Under the FTCA, the United States retains sovereign immunity except where specifically waived. The statute waives immunity in many cases, but it reserves immunity for claims based on discretionary regulatory functions, "whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Investigation and prosecution under § 21 of the Securities Acts is discretionary; therefore the United States is immune to these claims.[21] *See Board of Trade v. SEC,* 883 F.2d 525, 531 (7th Cir.1989).

■ Defendants' remaining counterclaim is based on alleged violations of the Right to Financial Privacy Act of 1978 (RFPA), 12 U.S.C. § 3405. Plaintiff asserts that this should be dismissed under Rule 12(b)(6) for failure to state a claim. Defendants provide no details in support of their allegations, nor do they even identify the alleged improprieties on which this claim is based. Therefore, the Court finds that defendants have not stated a claim for a violation of the RFPA, and the Court will dismiss this final counterclaim.

## VII. Relief Defendants

Count Four of the Amended Complaint seeks disgorgement of certain funds and assets transferred by defendant Taylor and now held by the relief defendants, Elizabeth Lawson and Wilkins McNair, Jr. Plaintiff's argument is that the relief defendants hold these assets in a constructive trust for the defrauded Advertising Pool investors.

■ It is clear that a gratuitous donee of fraudulently-obtained funds is not a bona fide purchaser and may be subject to a constructive trust. *See, e.g., Garner v. First Nat'l City Bank,* 465 F.Supp. 372, 385 (S.D.N.Y. 1979). Neither relief defendant disputes this point. However, the relief defendants argue that the Court lacks subject matter jurisdiction over them, and that they were paid out of the membership fees, which were not the spoils of fraud.

The argument that the funds granted to the relief defendants were paid out of legitimate membership fees lacks merit. First, the gross membership fees amassed by the BLC do not exceed $200,000, which does not cover the amounts transferred by Taylor from BLC accounts to the relief defendants. Furthermore, BLC co-mingled membership fees with other revenues, including the extensive Advertising Pool investments, and it is impossible to separate out the membership proceeds from the other BLC funds. Therefore, it is ridiculous to suggest that the relief defendants were paid solely from funds that represented a mere fraction of a percent of

---

**21.** In addition, claims based on interference with contract rights are specifically barred by the FTCA. 28 U.S.C. § 2680(h). *See also, Art Metal,* 753 F.2d at 1154.

the total BLC intake, and that were co-mingled indiscriminately with other funds.

Finally, when legitimate assets are co-mingled with illegitimate ones such that the assets cannot be separated out, a constructive trust may extend over the entire asset pool. *See, e.g., In Re Gotham Provision Co.,* 669 F.2d 1000, 1011 (5th Cir.1982) (cattle acquired in one manner and mingled with cattle acquired in another cannot be separated out, so entire herd is subject to trust), *cert. denied,* 459 U.S. 858, 103 S.Ct. 129, 74 L.Ed.2d 111 (1982); Austin Scott & William F. Fratcher, *The Law of Trusts* § 519.1 (4th ed.1989). Therefore, because the membership fees were freely co-mingled with the fraudulently-obtained Advertising Pool investments, and because defendant Taylor helped himself and his cronies to the co-mingled funds in the BLC accounts, even allegedly legitimate profits have become tainted. For this reason, the investors have an equitable interest in all BLC funds, whatever the original source of those.[22]

The relief defendants' other argument is equally devoid of merit, because this Court has proper subject matter jurisdiction. Indeed, the Court can exercise jurisdiction over plaintiff's disgorgement claims under two theories. First, under the Judicial Improvement Act of 1990, the Court has supplemental jurisdiction over claims against third parties "that are so related to claims in the action within original jurisdiction that they form part of the same case and controversy under Article III." 28 U.S.C. § 1367(a). Since the claims for disgorgement against the relief defendants arise from the same scheme of securities fraud, they unquestionably meet this standard for supplemental jurisdiction. In addition, the securities statutes themselves confer jurisdiction over the relief defendants. Federal courts are empowered to exercise jurisdiction over securities claims against non-violators when

necessary to ensure a complete remedy. *See Deckert v. Independence Shares, Corp.,* 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940); *International Controls Corp. v. Vesco,* 490 F.2d 1334, 1338 (2d Cir.1974), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974); *SEC v. Antar,* 831 F.Supp. 380, 398–99 (D.N.J.1993). This includes the exercise of jurisdiction over claims against non-violators when those claims seek disgorgement of wealth which has been unjustly transferred by a violator. *Antar,* 831 F.Supp. at 398–403. This exercise of jurisdiction is particularly appropriate where, as here, the relief defendants are gratuitous transferees who hold funds in constructive trust for defrauded investors.[23]

Both relief defendants also argue that they gave value for the assets they received, and therefore that these assets are not subject to disgorgement. For the most part these arguments are also meritless; however, the Court will examine the issue on an asset-by-asset basis.

### A. Relief Defendant McNair

Plaintiff seeks disgorgement of $120,000 from relief defendant McNair. McNair received this money from defendant Taylor as part of a trust he was setting up for Taylor's sons. Essentially, McNair accepted the money as payment for some of his stock in the Baltimore Mortgage Corporation, a company that he founded and owned. The stock then went into the corpus of the new trust. Plaintiff contends that this transaction was essentially a gratuitous gift from Taylor to McNair, and that the money is subject to disgorgement.

There is no dispute that defendant Taylor took this $120,000 from accounts fed by BLC investor money. Therefore, if relief defendant McNair is indeed a gratuitous transfer-

---

**22.** There is some suggestion that the relief defendants might be able to escape constructive trust if they can demonstrate that they were paid exclusively out of membership fees. *See, e.g., SEC v. Great Lakes Equities Co.,* 775 F.Supp. 211, 214 (E.D.Mich.1991), *aff'd,* 12 F.3d 214 (6th Cir. 1993). However, neither relief defendant has attempted to do this, and, given the haphazard accounting practices employed by defendant Taylor, neither would be capable of such a showing.

**23.** Relief defendant Lawson cites the Seventh Circuit case *SEC v. Cherif,* 933 F.2d 403 (7th Cir.1991) to argue that the Court should not exercise supplemental jurisdiction. However, the *Cherif* court explicitly stated that they were not considering a constructive trust scenario, such as the Court faces in the present case, and that Court was not operating under the broader supplemental jurisdiction rules created by the Judicial Improvements Act.

ee, there is no question that these funds would be subject to disgorgement. McNair contends, however, that he received these funds in exchange for value—a 30% interest in Baltimore Mortgage. However, McNair admits that these shares are presently worthless because Baltimore Mortgage has never been a profitable corporation and maintains bank accounts with less than $120,000. Furthermore, when McNair founded Baltimore Mortgage, he sold its shares to himself for $14.40 per share. However, two years later, when he "sold" 30% of those shares to defendant Taylor's trust, he charged $80.00 per share, even though the company had never shown any profit and was, in fact, on the road to insolvency.

Clearly, this transaction involving the "sale" of Baltimore Mortgage was little more than a sham. Relief defendant McNair's unsupported assertions are insufficient to overcome the weight of the evidence and create a question of fact on that issue. Defendant Taylor, and the investors who hold an interest in constructive trust on his assets, received no value for the $120,000 of BLC money that he gave to McNair. The stocks defendant Taylor "bought" were at best worth 1/6 of that amount, and in all likelihood were worthless. Therefore, relief defendant McNair is hardly a bona fide purchaser for value. Even if he did not know the true source of defendant Taylor's funds, McNair is a gratuitous transferee because he received a substantial amount of money without transferring any value in return. For this reason, McNair holds this $120,000 in constructive trust for its true owners—the investors of the Advertising Pool—and disgorgement is proper.

### B. Relief Defendant Lawson

Plaintiff seeks disgorgement of several assets held by relief defendant Lawson. Specifically, plaintiff seeks disgorgement of Lawson's interest in a $7500 cashier's check, a $273,000 residence that she owns jointly with defendant Taylor, a 1992 Jaguar, $8,000 in consulting fees paid to Ruby Communica-

tions—relief defendant Lawson's business—and a $50,000 loan from defendant Taylor to Ruby Communications. It is undisputed that each of these assets was transferred by defendant Taylor to relief defendant Lawson, or to her business. It is equally undisputed that defendant Taylor made these transfers from accounts fed by his acquisitions of BLC investor funds. Relief defendant Lawson, however, contends that she is entitled to keep at least some of these assets because she gave value for them.

### 1. Cashier's Check

■ Defendant Taylor gave Lawson a cashier's check for $7500 in March 1995. Lawson contends that this check was repayment for money she had given to defendant Taylor over the preceding fifteen months. However, she has no documentation [24] of this supposed loan and even admits that it was not a "formal loan." Nevertheless, despite the informality, the lack of record-keeping, and her relationship with defendant Taylor, she alleges that she expected repayment, and that the check merely met her expectation.

Even if the Court were willing to believe relief defendant Lawson's self-serving assertions,[25] this money would still be subject to disgorgement. It is undisputed that defendant Taylor purchased this check with funds drawn from BLC accounts. It is similarly undisputed that the BLC investors received no value on this loan, and it is highly suspect that Lawson ever gave any value to Taylor. In any case, there was never any actual loan agreement between Lawson and Taylor, and therefore there is no evidence that the gift was anything but gratuitous. For this reason, there are no material questions of fact as to this issue, and the $7500 given to Lawson is subject to disgorgement.

### 2. Residence

■ Relief defendant Lawson is listed as joint owner with defendant Taylor of a home in suburban Maryland. Lawson contends

---

24. Relief defendant Lawson supplies a self-typed "list" of amounts that supposedly were given to defendant Taylor. However, she supplies no actual documentation of those checks.

25. Relief defendant Lawson consistently has refused to testify on these matters before the Court or in depositions conducted by plaintiff. She has asserted her Fifth Amendment rights in support of such refusals.

that she supplied a substantial portion of the $110,999.75 down payment/settlement and that she has periodically made mortgage payments from her own savings. Plaintiff asserts that Lawson played no part in the original payment and that her mortgage payments are undocumented.

Relief defendant Lawson's assertion that she assisted in the initial payment on the house does not appear credible. She alleges that she contributed $12,500 to the payment, but she offers no documentation to support that assertion. Furthermore, on the very same day that he purchased a certified check in the amount of $110,999.75, defendant Taylor withdrew $111,200.00 from his Nationsbank account (which was filled with funds taken from BLC accounts). Defendant Taylor then used this certified check to make the initial payment on the house. This evidence shows that Taylor made the initial payment entirely with funds drawn from his own account; relief defendant Lawson has submitted no evidence at all to question that conclusion. Therefore, there is no material question of fact as to the source of this initial payment.

Relief defendant Lawson has supplied five or six copies of checks that may document her payments towards the mortgage on the house. Although plaintiff asserts that she made these payments with funds given to her by defendant Taylor, from BLC accounts, plaintiff has not substantiated that claim. If Lawson indeed made these payments with her own savings, she may be entitled to withhold these amounts from disgorgement. However, it is clear that relief defendant Lawson has not been making all the mortgage payments; plaintiff has provided evidence of several payments made by defendant Taylor from his own accounts, which were filled with tainted BLC money.

There is a question of fact as to the extent of these mortgage payments by relief defendant Lawson. However, even by her own evidence, Lawson had not made more than five payments, which total less than $10,000 on a house valued at over $273,000. Thus, she has hardly contributed a substantial por-

tion of the financing, and the Court must consider that her joint ownership is primarily a gift from defendant Taylor, who provided the bulk of the payments. As a gratuitous grantee, relief defendant Lawson is therefore subject to disgorgement of her interest in the house, with a credit to be applied for any payments she may have made with her own funds. The Court will consider the extent of this credit in a separate order, after further briefing and a hearing, if necessary.

### 3. Automobile

On August 9, 1995, defendant Taylor purchased a used 1992 Jaguar XJ6, which he gave to relief defendant Lawson. Defendant Taylor paid for the car with a cashier's check in the amount of $24,063. The check was purchased from an account filled by BLC funds. To the extent that the Jaguar was a gift from defendant Taylor, it is subject to disgorgement, even though it is titled solely in relief defendant Lawson's name.

Relief defendant Lawson contends that she contributed towards the purchase of this car. She asserts that she traded in her previous automobile for $6000 and that she contributed $4500 in cash. The bill of sale does reflect a $6000 trade-in allowance, and Lawson has supplied a check for $525 made out to the seller.[26] Therefore, while relief defendant Lawson has not documented the full extent of her alleged cash contributions, there is a question of fact as to how much of her own, non-BLC, money she did contribute to the purchase of the automobile. However, even by relief defendant Lawson's account, defendant Taylor supplied the majority of the purchase price, as a gift without value in return. Therefore, the car is subject to disgorgement, less a credit for the amount that relief defendant Lawson contributed from her own savings and from the trade-in of her car. The Court will consider the extent of this credit in a separate order, after further briefing, and a hearing, if necessary.

---

**26.** The bill of sale also indicates a separate payment of $475; presumably this payment was made by Lawson's check.

#### 4. Consulting Fees and Loan to Ruby Communications

Very soon after learning that he was under investigation by plaintiff, defendant Taylor paid $8000 in consulting fees to relief defendant Lawson and made several payments which supposedly were part of a $50,000 loan to Ruby Communications, which is Lawson's business. Plaintiff asserts that these payments were also gifts because the consulting fees were never earned and the loan was a sham transaction.

Relief defendant Lawson apparently does not dispute that the $8000 fee was unearned, because she never raises the issue in her responsive pleadings. Plaintiff presents evidence that the transfer was made immediately after defendant Taylor learned of the SEC investigation and that relief defendant Lawson did not provide services to earn this payment. Since Lawson does not dispute this evidence, there is no material issue of fact that the $8000 transfer was a gift from defendant Taylor. As such, it its subject to disgorgement.

■ Relief defendant Lawson does argue that the $50,000 loan was legitimate, and that the money can be collected only under the terms of the loan. However, plaintiff presents significant evidence that the transfer of funds from Taylor to Lawson was not a legitimate loan. First, it was made as a series of payments, not as a lump sum transfer. Second, while the loan was ostensibly made to Ruby Communications, not to relief defendant Lawson personally, Lawson used the funds for personal and household expenses—including landscaping, home furnishings, and assorted cash withdrawals. Finally, relief defendant Lawson has apparently defaulted on her obligations to pay back this loan, further raising the spectre of a sham and perhaps accelerating the payment of the entire debt principal.

Plaintiff has provided sufficient evidence to show that the $50,000 transfer was not a legitimate loan but a gratuitous gift. Relief defendant Lawson has provided no evidence beyond her own bald assertions to the contrary.[27] Those assertions are insufficient to raise a material question of fact as to the nature of the "loan." Therefore, plaintiff has carried its burden to show that the $50,000 was gratuitously given to relief defendant Lawson; as such, it is subject to disgorgement.

#### C. Summary

The assets held by relief defendants McNair and Lawson are subject to disgorgement. Relief defendant McNair must disgorge the $120,000 profit which he took on the "sale" of the Baltimore Mortgage Corporation stock. Relief defendant Lawson must disgorge $7500 to cover the cashier's check, $8000 to cover the unearned consulting fees, and $50,000 to cover the "loan" to Ruby Communications. Furthermore, she must disgorge her interest in the residence, with a credit for the mortgage payments that she made from her own savings, and she must disgorge either the 1992 Jaguar or its cash value, with a credit for her trade-in and for any payments she made from her own savings.

### VIII. Conclusion

Defendant Taylor, through defendant Better Life Club of America, carried out an elaborate pyramid scheme, marketing and selling worthless Advertising Pool securities through a network of fraud and deceit, brazenly playing on the trust of the club members and investors. Defendants Taylor and the Better Life Club pursued the scheme by making representations that they knew were untrue and by promising fabulous returns that they never intended to deliver. Over the course of their two and a half year fraud, defendants amassed over $45 million in small-scale "investments," from which defendant Taylor siphoned at least $800,000 for his personal use, and from which Taylor transferred over $200,000 to his cronies. Had plaintiff not stepped in to end this scheme, there is no doubt that defendant Taylor would have continued to line his own pockets, fiddling away funds while the Advertising Pool's financial situation burned.

---

27. Relief defendant Lawson refused to answer plaintiff's deposition questions concerning this loan, asserting her right to silence under the Fifth Amendment. She has provided little evidence as to the nature or circumstances of this "loan" arrangement.

The net effect of defendants' fraud is that hundreds of middle-class, small-scale investors are left holding losses that exceed $25 million. Defendants are liable to pay that full amount in restitution to the defrauded investors, and the relief defendants must disgorge the money and gifts that they received. Even with such disgorgement and liability, however, it is uncertain that the investors will ever recoup the full amount of their economic losses, much less regain the trust and peace of mind that defendants have so callously stolen from them.