**U.S. COMMODITY FUTURES TRADING COMMISSION,**
Plaintiff,

v.

**Anthony Eugene LINTON d/b/a The Private Trading Pool,**
Defendant.

**No. CV 11–21–TUC–FRZ.**

United States District Court,
D. Arizona.

April 27, 2011.

David Slovick, Rosemary Hollinger, Scott R. Williamson, Susan Jill Gradman, U.S. Commodity Futures Trading Commission, Chicago, IL, for Plaintiff.

## ORDER

FRANK R. ZAPATA, Senior District Judge.

Pending before the Court are Mark and Amy Klase's ("Klase") motion to intervene and motion to modify the statutory restraining order ("SRO") previously issued by the Court. For the reasons stated below, the motions are denied.

### Procedural Background

On January 11, 2011, the Commodities Futures Trading Commission ("CFTC") filed a Complaint, a motion for a SRO, motion for expedited discovery, and a motion for a preliminary injunction. The CFTC argued that Linton (d/b/a/ The Private Trading Pool) defrauded at least 19 of his friends and acquaintances in Tucson out of $650,000 in violation of the Commodities Exchange Act ("CEA"). On January 13, 2011, Judge Bury granted the CFTC's motion for a SRO and motion for expedited discovery, and set a hearing on the CFTC's motion for a preliminary injunction for February 17, 2011. Pursuant to the SRO, Linton and all other individuals are prohibited from disposing of, destroying, or otherwise encumbering any of the assets and documents related to the fraud at issue, and Linton was ordered to provide any documents and information pertaining to the CFTC's investigation.

On February 8, 2011, Klase filed a motion to intervene and motion to modify the SRO. On February 10, 2011, this case was randomly reassigned to this Court. On February 14, 2011, the Court issued an Order that: (1) rescheduled the preliminary injunction hearing to March 21, 2011; (2) set Klase's motions for hearing at the same time as the preliminary injunction hearing; and (3) set a briefing schedule pertaining to Klase's motions. At the March 21, 2011 hearing, new issues were

raised, and the Court ordered additional briefing from the parties.

### Background Pertaining to Linton's Ponzi Scheme

The record reflects that from October 2007 to the present, Linton (d/b/a/ The Private Trading Pool-"PTP") solicited and received at least $650,000 from at least 19 friends and acquaintances in Tucson for the purported purpose of trading off-exchange foreign currency contracts ("forex") on their behalf in a PTP pooled account.

During this period, Linton made numerous misrepresentations pertaining to the nature of his purported forex trading, the use of the pool participants' funds, and the safety and purported profits earned on investments. For example, Linton represented that pool participants would make an "8.33% per month average" return (i.e., "100% annual return") on their investment and stated that participants would make "$1,000 on every $1,000 every year ... [d]oubling [their] money every year." Linton claimed that he could achieve these absurd returns on their investment because he knew in advance "what News [would] be announced, and at the exact time it [would] be announced to the public over Reuters and AP News Wires, CNN, ABC, CBS, NBC, etc." As such, he claimed that he could make a "profit every time" in relation to his forex trading. As to the purported safety of the investment, he claimed that "at any time, your investment funds are available to you, in whole or in part. All it takes is .an email to me, or a phone call, and within 24 hours, a check for any amount currently in your account will be sent to you ... When you need it, in whole or in part, you can get it. A check is issued within 24 hours." He also misrepresented that investments in the PTP were "tax free" and did "not have to be claimed on any normal, or special, tax forms" because "all money changing hands are considered as gifts under IRS Tax Law." Linton's representations were false. Indeed, of the $650,000 in funds he solicited, Linton only used $76,000 of commingled participant funds and personal funds to trade forex; he lost $69,315 of those funds. Contrary to his representations to the pool participants, Linton misappropriated the majority of the funds he solicited to pay personal expenses (i.e., to buy items on eBay, pay credit card debts, make mortgage payments, and accumulate cash in a safe at his home). He also used a portion of the funds to pay earlier PTP participants purported profits similar to a Ponzi scheme. To the extent Linton actually engaged in very limited trading with the funds of his pool participants, his trading resulted in consistent net losses which resulted in at least a 91% decline in the value of the forex account. Linton attempted to conceal his fraud by misrepresenting to participants that new laws imposed by Congress and the National Futures Association prevented him from returning their funds. Despite numerous requests over many months, most PTP participants have not been able to recover their principal investment with Linton.

### Background Pertaining to Klase's Motion to Intervene and to Modify the SRO

According to Klase,[1] prior to 6/18/08, he invested $250,000 with Linton, and received "profits" of $29,165 stemming from Linton's Ponzi scheme. After 6/18/08, Klase invested $55,845 with Linton, and received $84,622 in "profits" from Linton's Ponzi scheme. Like all of the other victims that were duped out of their money by Linton, Klase was unable to recoup his principal upon his request to Linton. While Klase did receive some of his money

---

1. Mark Klase is an FBI Agent in Tucson.

back (i.e., $113,787), presumably because he was one of the earlier investors that requested some of his money back in the Ponzi scheme before it fell apart, Klase still has a loss of $192,058 in principal that he was unable to recover from Linton. Klase also spent approximately $19,140.50 in attorneys fees and costs in relation to a state court civil fraud action Klase filed against Linton in late 2010. Klase seeks to intervene and modify the SRO so he can sell Linton's tangible property to fully collect on his loss of principal and attorneys' fees. The problem with this proposition is that allowing Klase to fully recover his principal will come at the expense of all the other victims as it is extremely unlikely that Linton has sufficient assets to allow any them to fully recoup their significant losses.

In the summer of 2010, Klase cooperated with the CFTC in their investigation of this matter by providing information pertaining to Linton's fraudulent actions. Despite his knowledge of the CFTC's investigation of this case and their efforts to obtain restitution for all of Linton's victims, Klase informed the CFTC he was going to pursue his own civil remedies through a private attorney and filed his own civil action against Linton in Pima County Superior Court on October 26, 2010. On 10/26/10, the state court issued an "order for provisional remedy without notice-attachment" whereby a writ of attachment was issued to the Pima County Sheriff to attach a sufficient amount of Linton's property to satisfy Klase's demand of $25,000; the amount was limited to $25,000 as the Arizona statute at issue allowing the provisional remedy only allowed an attachment in the amount of the cash bond that Klase could post with the state court. In the motion, Klase argues that he could only post a $25,000 bond given the loss of much of his savings via Linton's fraud. In the motion, Klase also alleges that Anthony Linton voluntarily gave his property to his ex-wife (Susan Linton) to hide the property from Klase. Klase alleges that Susan was unwilling to hide Anthony's property from Klase. Klase alleges that on December 1, 2010, Klase, his attorney, and representatives of the Pima County Sheriff's Office met with Susan at Anthony's home for the purpose of seizing Anthony's property. Klase alleges that Susan voluntarily agreed to give Klase possession of certain property belonging to Anthony, and that Klase has had this property in his custody and control since 12/1/10, and has been paying storage fees for this property since that date. Klase has attached an eight-page list of Anthony's property that has been in his possession since 12/1/10. *See* Klase's Ex. 1(A). Among the property listed in Klase's exhibit are: (1) five vehicles; (2) eighty-two guns; (3) fifteen knives; (4) four wrist watches; (5) many dozens of collectors items such as unopened boxes of Star Wars toys, statues, and figurines; train sets; and cuckoo clocks; (6) numerous other household goods (furniture, tools, etc.).

However, it was not until January 19, 2011, that Klase actually obtained a Default Judgment from the Pima County Superior Court. The default judgment was issued and all relief requested by Klase was granted in light of the fact that Linton presumably failed to make any appearance to present a defense in the case; thus, the state court signed off on a proposed order submitted by Klase's counsel. That default judgment awarded compensatory damages of approximately $2.9 million, punitive damages of $500,000, and treble damages of $576,174; it also granted a constructive trust over some of Linton's tangible property as reflected in Klase's exhibit 1(A) as referenced above.

The state court 1/19/11 default judgment at issue was obtained six days after Judge

Bury issued the 1/13/11 SRO which "[p]rohibit[ed] [Linton] and any other person" from "withdrawing, removing, assigning, transferring, pledging, encumbering, disbursing, dissipating, converting, selling, or otherwise disposing ... of any funds, assets, or other property of" Linton. *See* SRO at 4–5. Klase's attorney had notice of Judge Bury's SRO on 1/13/11 as counsel for the CFTC emailed Klase's counsel informing him of the SRO and attached a copy of Judge Bury's SRO. Nevertheless, Klase's counsel participated in the 1/19/11 default judgment hearing. After Klase obtained the 1/19/11 default judgment, Klase's counsel contacted counsel for the CFTC to see if they would stipulate to modify the SRO to allow them to collect on the default judgment. The CFTC refused to stipulate, explaining the need for the federal district court to "make an informed decision as to the total amount of unlawful proceeds retained by [Linton]," and "to preserve the status quo while the CFTC investigates and determines the losses sustained by investors stemming from the fraud." The CFTC also stressed the importance of "preserv[ing] the district court's jurisdiction over Linton's assets so that the court can later make distributions, as appropriate, to [Linton's] investors and other bona fide claimants."

Thereafter, Klase filed the motion at issue in this case seeking to intervene and to modify the SRO such that he could collect on the 1/19/11 state court default judgment.

### Klase's Motion to Intervene is Denied

Klase argues that he is entitled to intervene in this case pursuant to FED.R.CIV.P. 24(a)(2) which states in part: "On timely motion, the court must permit anyone to intervene who .... claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's

ability to protect its interest, unless existing parties adequately represent that interest."

■ A party seeking to intervene "is required to prove each of these four elements [of Rule 24(a)(2) ]; the lack of one element requires that the motion to intervene be denied." *Vollmer v. Publishers Clearing House,* 248 F.3d 698, 705 (7th Cir.2001); *see also League of United Am. Citizens v. Wilson,* 131 F.3d 1297, 1302 (9th Cir.1997)("Courts in this circuit have recognized that the requirements of Rule 24(a)(2) may be broken down into four elements, each of which must be demonstrated in order to provide a non-party with a right to intervene: (1) the application must be timely; (2) the applicant must have a 'significantly protectable' interest relating to the transaction that is the subject of the litigation; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4) the applicant's interest must be inadequately represented by the parties before the court.").

Klase asserts that he meets all of the elements of Rule 24(a)(2). Klase generally argues that he has an interest in the property at issue as he was defrauded by Linton, that disposing of the action without modifying the SRO impairs his interest in the property as the SRO is preventing him from selling Linton's property for his own benefit, and that the CFTC does not adequately represent him as they oppose his request to collect on his state court judgment by selling Linton's property solely for his own benefit.

■ The CFTC correctly argues that Klase fails to show that the CFTC inadequately represents his interests in the case. The CFTC emphasizes that Klase's interests in the case are essentially identi-

cal to the other 18[2] fraud victims as they were all defrauded by Linton in the same manner and during the same time period. Furthermore, the CFTC is prosecuting this case to hold Linton accountable for his fraudulent actions such that the CFTC can recover as much of the limited proceeds as possible from Linton to equitably divide amongst all of the victims. While it is understandable that Klase wants to maximize his own recovery and otherwise recoup all of his principal investment, this interest is no different than all of the other victims who would likewise like to maximize their own recovery. While it is extremely unlikely that any of the victims will recoup all of their losses, the CFTC is equally representing all of the victims to the extent it is attempting to maximize the recovery of assets for all of them; in light of the foregoing, Klase has not shown that the CFTC inadequately represents his interests in this case. *See, e.g., League of United Am. Citizens v. Wilson,* 131 F.3d 1297, 1305 (9th Cir.1997)("Under well-settled precedent in this circuit, [w]here an applicant for intervention and an existing party have the same ultimate objective, a presumption of adequacy of representation arises."); *American Nat'l Bank & Trust v. City of Chicago,* 865 F.2d 144, 148 n. 3 (7th Cir.1989) ("[A] presumption of adequacy of representation arises where the proposed intervenors and a party to the suit have the same ultimate objective."); *CFTC v. Chilcott Portfolio Mgmt.,* 725 F.2d 584, 586 (10th Cir.1984)(affirming denial of motion to intervene as investor's interests were adequately represented in the CFTC enforcement action via a claims procedure established by the court); *CFTC v. Lofgren,* 2003 WL 21639118, *3

(N.D.Ill.2003)(denying individual investor's motion to intervene in CFTC action as interests were adequately represented; "The CFTC's goal is to protect the public at large and to stop and deter the future violations of the law. These goals differ slightly from [the individual investor's] desire to maximize his own recovery. Thus, it would appear that the CFTC will adequately represent [the individual investor's] interests insofar as they are primarily concerned with preventing defendants from further dissipating the funds."); *SEC v. TLC Investments and Trade Co.,* 147 F.Supp.2d 1031 (C.D.Cal.2001)("[T]he SEC's interests in [pursuing a fraud action arising from a Ponzi scheme] include protection of the public at large and stopping and deterring future violations of the law, which differ slightly from the investors' desire to maximize their own recovery.").

As the CFTC adequately represents Klase's interests, the motion to intervene is denied.[3]

## In the Alternative, the Motion to Modify the SRO is Denied

As Klase has no basis to intervene, and therefore no right to file a motion to modify the SRO, the motion to modify the SRO is denied as well. In the alternative, the motion to modify the SRO is denied on the merits.

Klase argues that the SRO should be modified as it is acting as an injunction against enforcement of a state court judgment, and that there is generally a strong federal policy against interfering with state court actions due to concerns of federalism and comity. Klase also argues that the property Klase seeks to sell is not

2. There are 19 known fraud victims, but the CFTC expects that there may be more as Linton himself previously represented to investors that there were 161 investors involved in his PTP.

3. While Klase did not seek permissive intervention, the Court notes that the Court would not permit permissive intervention under the circumstances of this case. *See* FED.R.CIV.P. 24(b).

even subject to the SRO as the state court default judgment gave him a constructive trust over Linton's property such that it is now Klase's rightful property. Klase also argues that based on equitable principles alone, he should be able to sell the Linton property for his own benefit as he alone took the initiative to protect his own interests while the other victims did not protect their own interests.

■ As referenced above, however, it was not until January 19, 2011 that Klase actually obtained a Default Judgment from the Pima County Superior Court pertaining to Linton's property. The state court default judgment at issue was obtained six days after Judge Bury issued the 1/13/11 SRO which "[p]rohibit[ed] [Linton] and any other person" from "withdrawing, removing, assigning, transferring, pledging, encumbering, disbursing, dissipating, converting, selling, or otherwise disposing ... of any funds, assets, or other property of" Linton. Klase's attorney had notice of Judge Bury's SRO on 1/13/11 as counsel for the CFTC emailed Klase's counsel informing him of the SRO and attached a copy of the SRO. Nevertheless, Klase's counsel participated in the 1/19/11 default judgment hearing. Thus, it appears that Klase obtained a subsequent 1/19/11 state court judgment that conflicts with a prior federal court order (the 1/13/11 SRO). Klase's arguments regarding federal court interference with his right to collect on a state court judgment are rejected. Under the circumstances at bar, Klase has no right to undermine this Court's authority to ensure an equitable pro rata distribution to all of the victims in this case. *See SEC v. Credit Bancorp, Ltd.,* 290 F.3d 80, 88–89 (2nd Cir.2002)("In any event, whatever beneficial interest [the fraud victim] might have in the transferred shares, arising from a constructive trust, does not defeat the equitable authority of the District Court to treat all the fraud victims alike (in proportion to their investments) and order a pro rata distribution. Courts have favored pro rata distribution of assets where, as here, the funds of the defrauded victims were commingled and where victims were similarly situated with respect to their relationship to the defrauders."); *CFTC v. Topworth Int'l, Ltd.,* 205 F.3d 1107, 1115 (9th Cir.2000)(investor argued that "[b]ecause ... his records meticulously show his ending account balance, [he] claims he should not be pooled with the other investors, but should receive his final balance, plus interest, before the pro rata distribution is made"; this argument was rejected and the district court's decision to order a *pro rata* distribution among all the investors was affirmed as it was within the district court's broad discretion).

Klase's argument that he should be able to maximize his recovery at the expense of all the other victims based on equitable considerations is without merit. *See generally U.S. v. Real Property Located at 13328 and 13324 State Highway 75 North, Blaine County, Idaho,* 89 F.3d 551, 553 (9th Cir.1996)(rejecting fraud victims request to collect damages outside of the pro rata plan approved by the court; reasoning that "Wymer defrauded many innocent parties. The fund created to make these parties whole is insufficient to allow full restitution to all victims. Rather than participate in the SEC's plan to distribute this inadequate fund pro rata, the PDRA seeks to better its position by using tracing fictions to make a claim to all proceeds from the sale of the Idaho property ... [T]he equities demand that all Wymer's defrauded customer[s] share equally in the fund of pooled assets in accordance with the SEC plan."); *SEC v. Elliott,* 953 F.2d 1560, 1569 (11th Cir.1991)("To allow any individual to elevate his position over that of other investors similarly victimized by asserting claims for restitution and/or reclamation of specific assets based upon equitable theories of relief such as fraud, misrepresenta-

tion, theft, etc. would create inequitable results, in that certain investors would recoup 100% of their investment while others would receive substantially less.")(internal quotes and citations omitted).

Lastly, the Court notes that Klase's counsel raised a new substantive argument that was never addressed in the briefs at the 3/21/11 hearing. At the hearing, Klase appeared to argue that the Court did not have proper jurisdiction over the case as it pertained to Klase as the CFTC was prosecuting this case under an updated provision of the CEA that became effective on 6/18/08 pertaining to forex, and that the CFTC only had jurisdiction pertaining to events that took place after 6/18/08. As Klase argued that he invested the majority of his funds with Linton prior to 6/18/08, jurisdiction as to him was problematic. In light of this new argument asserted for the first time at the hearing, and the fact that the CFTC never had fair notice and an opportunity to address this argument, the Court issued an Order directing the parties to file supplemental briefs on the issue.

Klase's supplemental brief concedes that the Court has federal question jurisdiction over the case (i.e., as the case is being prosecuted by a federal agency pursuant to a federal statute), and would have supplemental jurisdiction over other issues that arise out of Linton's fraudulent actions in this case. *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."); 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy ... Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.").

Although Klase concedes that the Court properly has jurisdiction over this case, Klase argues that "because of the limited scope of the commodity exchange act and limited jurisdiction of the CFTC, the Court will have only limited authority to grant relief in this action." *See* Klase's Supplement at 4. Klase argues that since the CFTC is prosecuting this case under an updated provision of the CEA that became effective on 6/18/08 pertaining to forex, the CFTC only has authority to seek relief for actions occurring after 6/18/08. As Klase invested the majority of his funds with Linton prior to 6/18/08, he argues that the Court would not be able to provide complete and equitable relief as to him "as this action can only produce recovery for fraudulent off-exchange forex transactions that occurred after June 18, 2008." *See id.*

In response, the CFTC argues that Klase's argument is refuted by case law and Klase's argument is off base as the CFTC is not asking the Court to exercise jurisdiction over activity that occurred before 6/18/08, but to exercise equitable jurisdiction over a group of existing assets that consist in part of money obtained through fraud after 6/18/08 which is within the Court's equitable authority. According to Klase, prior to 6/18/08, he invested $250,000 with Linton, and received "profits" of $29,165 stemming from Linton's Ponzi scheme. After 6/18/08, Klase invested $55,845 with Linton, and received $84,622 in "profits" from Linton's Ponzi scheme. Thus, Klase is still missing $192,058 of his principal. As in any Ponzi scheme, the "profits" investors received from Linton were financed by Linton's fraudulent actions in duping other investors out of money to funnel to other investors as "profits"; such "profits" can no longer be paid out in a Ponzi scheme

when investors continually seek their "profits" or principal, and when new investors are unavailable to defraud. It is undisputed that Klase invested money both before and after 6/18/08, and that he received "profits" from the Ponzi scheme both before and after 6/18/08. Furthermore, before and after 6/18/08, Linton engaged in a Ponzi scheme that duped at least 19 people out of a substantial amount of money (a total of approximately $650,000), and that this pool of money (including Linton's money and the other 18 victims) was extensively commingled in multiple bank accounts Linton controlled. This pool of commingled funds was used to make fraudulent payments of "profits" to Klase and the other 18 victims, and was also misappropriated by Linton to make very large credit card payments, house payments, and to purchase many expensive items on ebay. Under such circumstances, where the Klase's money was extensively commingled with the money of the other 18 victims both before and after 6/18/08, this Court has the equitable authority to exercise control over all of the remaining assets associated with Linton's fraudulent actions such that it can be equitably divided on a pro rata basis amongst all the victims. *See, e.g., SEC v. Better Life Club of Am., Inc.*, 995 F.Supp. 167, 181 (D.D.C.1998)("[W]hen legitimate assets are commingled with illegitimate ones such that the assets cannot be separated out, a constructive trust may be extended over the entire asset pool ... the investors have an equitable interest in all ... funds, whatever the original source of those."); *SEC v. Byers*, 637 F.Supp.2d 166, 180–81 (S.D.N.Y. 2009)(funds that were part of a unified scheme to defraud were properly part of the receivership estate); 7 U.S.C. § 13a–1 (whenever a person has "engaged, is engaging, or is about to engage" in a violation of the CEA the court has the authority to issue an injunction prohibiting "any

person ... from withdrawing, removing, dissipating, or disposing of any funds, assets or other property" related to fraud in violation of the CEA); *CFTC v. Wilshire Inv. Management Corp.*, 531 F.3d 1339, 1344 (11th Cir.2008)("The CFTC here invoked the jurisdiction of the District Court to enjoin acts and practices made illegal by the [CEA] and to enforce compliance with the [CEA]. Such a jurisdiction is an equitable one ... That a court's jurisdiction under § 13a–1 includes equitable remedies is well established ... [T]he unqualified grant of statutory authority to issue an injunction under § 13a–1 carries with it the full range of equitable remedies ...")(internal quotes and citations omitted); *Porter v. Warner Holding Co.*, 328 U.S. 395, 397–99, 403, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946)(in interpreting a provision of the Price Control Act which is similar to § 13a–1, the Court stated: "[T]he Administrator [of the Price Control Administration] invoked the jurisdiction of the District Court to enjoin acts and practices made illegal by the Act and to enforce compliance with the Act. Such a jurisdiction is an equitable one. Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction. And since the public interest is involved in a proceeding of this nature, those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake ... Power is thereby resident in the District Court, in exercising this jurisdiction, to do equity and to mould each decree to the necessities of the particular case ... It may act so as to adjust and reconcile competing claims and so as to accord full justice to all the real parties in interest; if necessary, persons not originally connected with the litigation may be brought before the court so that their rights in the subject matter may be determined and en-

forced. In addition, the court may go beyond the matters immediately underlying its equitable jurisdiction and decide whatever other issues and give whatever other relief may be necessary under the circumstances. Only in that way can equity do complete rather than truncated justice ... Nothing is more clearly a part of the subject matter of a suit for an injunction than the recovery of that which has been illegally acquired and which has given rise to the necessity for injunctive relief. To be sure, such a recovery could not be obtained through an independent suit in equity if an adequate legal remedy were available ... [W]here, as here, the equitable jurisdiction of the court has properly been invoked for injunctive purposes, the court has the power to decide all relevant matters in dispute and to award complete relief even though the decree includes that which might be conferred by a court of law ... [T]he court has inherent power to bring in all the interested parties and settle the controversies or to retain the case until the matters are otherwise litigated.")(internal quotes and citations omitted).

### Conclusion

Accordingly, in light of the foregoing, IT IS HEREBY ORDERED that Klase's motion to intervene and motion to modify the SRO are denied.